[Civ. No. 14770. Fourth Dist., Div. One. May 11, 1978.]

THE PEOPLE ex rel. EVELLE J. YOUNGER,
as Attorney General, etc., Plaintiff and Respondent, v.
LOCAL AGENCY FORMATION COMMISSION
OF SAN DIEGO COUNTY, Defendant and Appellant;
BORDER AREA CITIZENS FOR DEANNEXATION et al.,
Interveners and Appellants.

CITY OF SAN DIEGO, Plaintiff and Respondent, v.
LOCAL AGENCY FORMATION COMMISSION
OF SAN DIEGO COUNTY, Defendant and Appellant;
BORDER AREA CITIZENS FOR DEANNEXATION et al.,
Interveners and Appellants.

COUNSEL

McDonald, Riddle, Hecht & Worley, McDonald, Hecht & Worley and Donald R. Worley for Defendant and Appellant.

Miller, Boyko & Bell and Terry D. Harper for Interveners and Appellants.

Evelle J. Younger, Attorney General, C. Foster Knight and Norman N. Flette, Deputy Attorneys General, John W. Witt, City Attorney, and Donald W. Detisch, Deputy City Attorney, for Plaintiffs and Respondents.

OPINION

**STANIFORTH, J.**—This appeal presents the question whether the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA) and the Knox-Nisbet Act (Gov. Code, §§ 54773-54799.5) require appellant Local Agency Formation Commission of San Diego County (LAFCO) to prepare and file an environmental impact report (EIR) preliminary to the exercise of its discretion to approve or disapprove a proposed deannexation of some 25 square miles of territory currently part of the City of San Diego.

It was LAFCO's determination, after a series of administrative hearings on a petition for deannexation filed by appellant Border Area Citizens for Deannexation (BAC), the proposed deannexation "amounted to a change in governmental jurisdiction" and therefore found the exclusion would not have any significant impact on the environment; an EIR was not required. LAFCO then prepared and filed a "negative declaration" embodying that finding with the County Clerk of San Diego County on December 20, 1974. This action permitted BAC to circulate a petition to obtain voters' signatures to place the issue of deannexation of the territory upon the ballot at a special election. However, on January 9, 1975, LAFCO rescinded its earlier action and further hearings (Apr. 7, 1975) again determined an EIR was not required for the same reasons set forth in its December 20, 1974, negative declaration.

The following day, April 8, 1975, LAFCO filed with the San Diego County Clerk a further "negative declaration" again approving the proposed exclusion upon these premises: The deannexation would have no significant effect on the environment, it was "solely a change in governmental administration." No EIR was required.

In response to LAFCO's action, the State of California (State) on April 22, 1975, sought a writ of mandate in the superior court to compel LAFCO to set aside its negative declaration and to prepare an EIR before proceeding further with consideration of the deannexation proceedings.[1]

After hearing, the superior court determined the deannexation proposal was not exempt from CEQA requirements; it was a "project" which may have significant impact on the environment and LAFCO, as the "lead agency," was required to prepare the EIR.

The trial court made appropriate findings of fact and conclusions of law, and issued its peremptory writ commanding LAFCO to set aside its negative declaration and to prepare a detailed EIR and consider and articulate the environmental factors at each stage of its decision-making process. This appeal followed.

LAFCO asserts, as grounds for appeal, (1) it is exempt in its consideration of this deannexation petition from CEQA requirements; (2) the deannexation proposal does not constitute a "project" under CEQA; (3) if it does constitute a "project" it may not have a significant effect on the environment; and (4) it is not the appropriate "lead agency" with the duty to prepare an EIR. It is urged if LAFCO is required to prepare an EIR, it need consider fewer environmental factors than the trial court by its judgment and writ required. Finally, LAFCO contends the requirement of the EIR in this case violates First and Fourth Amendment federal constitutional rights of BAC.

Fundamental to, and determinative of the principal issues presented, is whether there is substantial evidence in the record to support the trial court's findings and judgment.

---

[1]Respondent City of San Diego (City) filed a similar petition for writ of mandate seeking the identical relief. These actions were consolidated for trial. BAC intervened in both actions. The County of San Diego (County) appeared as amicus curiae on behalf of State and City.

## FACTS—THE APPLICATION FOR DEANNEXATION

A real party in interest (BAC) is an unincorporated association composed principally of landowners in the Tijuana floodplain. On May 21, 1974, this group submitted its application to LAFCO for approval of the deannexation from the City of San Diego of about 25 square miles (16,500 acres) of territory located in the southwestern corner of San Diego County and encompassing the communities known as San Ysidro, Nestor and Palm City.[2] About 45,000 people and 9,314 registered voters reside in this territory. As a precondition to the deannexation proceedings, the proponents (BAC) were required to circulate a petition among the electors of the City of San Diego from which the territory is to be excluded, and obtain signatures of the majority of the qualified electors as shown by the votes cast at the last municipal election. Only upon successful circulation of such a petition does the city's legislative body submit the proposition for deannexation to the electors of the city in a special election. (Gov. Code, § 35501.) A majority of the voters at such special election must approve the exclusion.

As a further precondition, the petition for exclusion (Gov. Code, § 54775, subd. (g)(1)) shall not be circulated or filed until approval is first obtained from LAFCO. (Gov. Code, § 35500.1.) LAFCO's role is limited to approval or disapproval of BAC's petition. Pursuant to this requirement, BAC submitted its petition to LAFCO and therein expressed dissatisfaction with the decision of the San Diego City Council abandoning its 1966 border area plan. That plan contemplated intensive development in the Tijuana River floodplain. In abandoning the 1966 border area plan, the City of San Diego also withdrew support for the construction of a massive concrete-lined flood control project in the Tijuana River Valley that would have facilitated intensive residential, commercial and industrial development in the otherwise agricultural and open space areas of the floodplain.

Further, the application specified the City of San Diego's 1966 border area plan would be reinstated as the guiding land use planning document for land use within the excluded territory after exclusion is completed, including the construction of the concrete-lined flood control channel.

---

[2]The mechanics of LAFCO's approval are governed by Government Code sections 35500-35511 (exclusions of inhabited territory).

The application expressed dissatisfaction with police services, police administration, and fire protection in the area, and a desire to see the establishment of a separate municipal court in the San Ysidro area and a "wish to eliminate planning by outsiders not familiar with Border Area requirements."

Lastly, the application expresses the intent of BAC to incorporate the deannexed area as a new city or to annex the area to the neighboring City of Imperial Beach. BAC agrees if deannexation is successful, the territory would forthwith revert to the status of unincorporated lands under the jurisdiction of San Diego County.

FACTS—LAFCO PROCEEDINGS

On July 25, 1974, LAFCO's staff completed an "initial study" of the proposed deannexation and recommended to LAFCO that it serve as the lead agency in preparing and considering an EIR assessing potential adverse environmental impacts before approving or disapproving the proposed deannexation. This recommendation and the subsequent similar recommendation (Sept. 4) were, in part, based upon and in response to, the plans and proposals expressed in BAC's application. It was also based upon the environmental impacts associated with the reestablishment of the 1966 border area plan and construction of the concrete-lined flood control channel.

Specifically, the staff's recommendation stated in part: "It is an objective of this proposal to relieve the land use restrictions and encourage greater development of the Tia Juana River Valley. *A policy shift of this nature would require intensified flood measures which would result in a physical impact on the valley environment.*" (Italics added.)

On September 17, 1974, LAFCO determined, contrary to its staff recommendations, and without receiving independent evidence of environmental data, an EIR was not required because the proposed deannexation represented "solely a change in governmental jurisdiction." On the same date LAFCO filed with the San Diego County Clerk its negative declaration stating the proposed San Ysidro exclusion could not have a significant effect on the environment because the proposal would result merely in a change in governmental administration.

Thereafter (Oct. 23) the LAFCO staff completed a special report principally devoted to the impact on governmental services of the proposed deannexation. The staff found: ". . . it is obvious that the Border Area, left to its own devices, could not support the present level of services rendered by the City of San Diego. It is also evident that *in order to carry on such services . . . the subject area would have to either annex to existing governmental agencies or form new agencies.* The County does not perform those services on a county-wide basis nor does it support them from its general fund." (Italics added.)

On December 12, 1974, LAFCO held a public hearing and again determined the proposed deannexation would have no significant effect on the environment. It was not required to prepare an EIR. LAFCO then approved the proposed deannexation and on December 20, 1974, LAFCO filed a notice of determination with the San Diego County Clerk which incorporated its approval decision and its decision no EIR was required.

Upon a petition for reconsideration LAFCO rescinded its December 20, 1974, approval of deannexation and its notice of determination. Thereafter the staff reports followed again contrary to the determinations made by LAFCO. The matter peaked on April 7, 1975, when LAFCO held a public hearing and again determined no EIR was required in its consideration of the proposed deannexation. The following day (Apr. 8, 1975) LAFCO filed with the San Diego County Clerk a negative declaration on the proposed deannexation containing LAFCO's findings and approval of the deannexation proposal. It would have no significant effect on the environment because "[t]he proposal represents solely a change in governmental administration." At this juncture the State sought a writ of mandate from the superior court.

The trial court found LAFCO's findings and determinations as expressed in the negative declaration were not supported by substantial evidence. Therefore, it issued its writ compelling LAFCO to set aside its April 8 negative declaration and to prepare and consider an EIR with respect to the deannexation application.

## ISSUES

LAFCO asserts trial court error in concluding as a matter of law LAFCO's approval or disapproval of this deannexation petition was a

"project" under CEQA. LAFCO assigns three reasons for this conclusion. First, the proposed exclusion is exempt from the proposed definition of "project" because it is the submittal of a proposal to a vote of the people of the City of San Diego. (Tit. 14, Cal. Admin. Code, § 15037, subd. (b)(4).) Second, LAFCO's consideration of the proposed exclusion is not an activity "directly undertaken by any public agency" within the meaning of Public Resources Code section 21065, subdivision (a). And thirdly, LAFCO's consideration of the proposed exclusion is not an activity "involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use . . . ." (Tit. 14, Cal. Admin. Code, § 15037, subd. (a)(3).)

We examine these arguments in order of presentation. First, the guidelines for the implementation of CEQA 1970 (tit. 14, Cal. Admin. Code, § 15037) provides in pertinent part:

"(a) Project means the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately, that is any of the following:

"(1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities, clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100-65700.

"(2) An activity undertaken by a person which is supported in whole or in part through public agency contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(3) An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies.

"(b) Project does not include:

". . . . . . . . . . . . . . . . . . . .

"(4) The submittal of proposals to a vote of the people of the State or of a particular community.

"(c) The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." LAFCO asserts the deannexation petition here falls within the exclusionary language of section 15037, subdivision (b)(4). It deals with the submittal of a proposal to a vote of the people of a particular community. LAFCO asserts it is simply a consideration of a proposed change in governmental jurisdiction and *the term "project" refers to the underlying activity and not the governmental approval process,* citing section 15037, subdivision (c). To buttress these conclusions LAFCO relies upon *Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com.,* 51 Cal.App.3d 648 [124 Cal.Rptr. 635], and would distinguish *Bozung* v. *Local Agency Formation Com.,* 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017].

The determination of whether a deannexation petition is a "project" under CEQA is not resolved by the ambiguous language of section 15037, subdivisions (b)(4) and (c). We must examine the meaning of "project" in the light of an interrelated statutory framework creating and assigning functions to LAFCO.

■ The Knox-Nisbet Act created LAFCOs (Gov. Code, §§ 54780-54785) in each county with broad powers designed to discourage urban sprawl and encourage orderly development of local government agencies. While LAFCO does not have the authority or power for direct land use planning or zoning powers, it directly affects these functions assigned to other governmental units through its power to approve, approve conditionally or disapprove, annexations, deannexations, and governmental incorporations. LAFCO, by approving a particular local governmental agency, will determine which of two competing general land use plans will apply.

Specifically, Knox-Nisbet (Gov. Code, § 54790) grants LAFCO these powers and duties among others:

"(a) To review and approve or disapprove with or without amendment, wholly, partially or conditionally proposals for:

"(1) The incorporation of cities;

"· · · · · · · · · · · · · · · · · · · ·

"(3) The annexation of territory to local agencies, (other than local agencies the annexation of territory to which is required to be made pursuant to the provisions of Division 1 (commencing with Section 56000) of Title 6 of this code); provided that a commission shall not impose any conditions which would directly regulate land use or subdivision requirements. Nothing in this subsection, however, shall be construed as prohibiting a commission from requiring, as a condition to annexation, that a city prezone the territory to be annexed; provided that the commission shall not specify how or in what manner the territory shall be prezoned.

"(4) The exclusion of territory from a city." In performance of the statutory duties assigned, factors to be considered by LAFCO in review of a deannexation proposal shall include, but not be limited to:

"(a) Population, population density; *land area and land use*; per capita assessed valuation; *topography, natural boundaries, and drainage basins*; proximity to other populated areas; *the likelihood of significant growth in the area,* and in adjacent incorporated and unincorporated areas, during the next 10 years.

"(b) Need for organized community services; the present cost and adequacy of governmental services and controls in the area; probable future needs for such services and controls; probable effect of the ... exclusion and of alternative courses of action on the cost and adequacy of services and controls in the area and adjacent areas. ...

"(c) *The effect of the proposed action and of alternative actions, on adjacent areas,* on mutual social and economic interests and on the local governmental structure of the county.

"(d) *The conformity of both the proposal and its anticipated effects* with both the adopted commission policies on providing planned, orderly, efficient patterns of urban development and the policies and priorities set forth in Section 54790.2 of this code.

"(e) The effect of the proposal on maintaining the physical and economic integrity of lands in an agricultural preserve in open-space uses.

"....................................

"(g) Conformity with appropriate city or county general and specific plans.

"(h) The 'sphere of influence' of any local agency which may be applicable to the proposal being reviewed." (Gov. Code, § 54796; italics added.)

Finally, we note these further legislative commands to LAFCO found within Knox-Nisbet: LAFCOs are directed by the Legislature to develop and determine the "sphere of influence" of each local governmental agency within the county so that LAFCO can use the "sphere of influence" plan in carrying out its purposes and duties for planning and shaping the logical and orderly development of local government agencies. (Gov. Code, § 54774.) It is the express intent of the Legislature that LAFCO establish policies and exercise their powers in a manner "to encourage and provide planned, well-ordered, efficient urban development patterns with appropriate consideration of preserving open-space lands within such patterns." (Gov. Code, § 54774.5.) To establish the mandated policies and standards and in order to exercise its broad powers in an informed matter, LAFCOs are directed to initiate and make studies of existing government agencies based in part upon "land use information, studies, and plans of cities." (Gov. Code, § 54774.)

The provisions of Knox-Nisbet (assigning duties to LAFCO) must be read in conjunction, harmonized, with CEQA. (Pub. Resources Code, § 21000 et seq.) ". . . Knox-Nisbet dovetails with CEQA. . . . We . . . enforce the legislative mandate that before acting, LAFCO was bound to address itself to environmental considerations in accordance with the procedures set forth in CEQA" said the Supreme court in *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 282.

In *Bozung,* a petition for writ of mandate sought to require LAFCO to certify an environmental impact report before approving the City of Camarillo's annexation of an unincorporated area of Ventura County. The allegation of the complaint included not only the fact the annexed area "would be used 'for residential, commercial and recreational uses,' and that such development was 'anticipated . . . in the near future' " (*id.* at pp. 269-270), but as well the fact that such development depended upon approval of and completion of the annexation. The Supreme Court made these pertinent observations: "No one makes any bones about the fact that the impetus for the Bell Ranch annexation is Kaiser's desire to

subdivide 677 acres of agricultural land, a project apparently *destined to go nowhere in the near future as long as the ranch remains under county jurisdiction.* The city's and Kaiser's application to LAFCO shows that this agricultural land is proposed to be used for 'residential, commercial and recreational' purposes. Planning was completed, preliminary conferences with city agencies had progressed 'sufficiently' and development in the near future was anticipated. In answer to the question whether the proposed annexation would result in urban growth, the city answered: 'Urban growth will take place in designated areas and only within the annexation.' " (Italics added; *id.* at p. 281.)

The Supreme Court concluded LAFCO approval of the annexation was a "project" under the law. It was an "entitlement for use" requiring preparation of an EIR because it might have a significant effect on the environment.

*Bozung* concerned an application for annexation while we here confront a deannexation proposal. However, the reasoning by the Supreme Court has applicability here where it was said:

"We agree with plaintiffs and the Attorney General that an approval of an annexation to a city is covered both by subdivision (a) and subdivision (c) of section 21065. It is covered by subdivision (a) because it obviously is an activity directly undertaken by a public agency. It is covered by subdivision (c) because it involves the issuance to a 'person' as defined in section 21066, that is to say, a city, of an entitlement for use. That, in theory, the city eventually may not use the entitlement by not annexing, does not retroactively turn a project into a nonproject.

"We therefore hold that a LAFCO approval of a city annexation is a project within the meaning of subdivisions (a) and (c) of section 21065." (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 278-279.) (See also *Wildlife Alive* v. *Chickering,* 18 Cal.3d 190, 198 [132 Cal.Rptr. 377, 553 P.2d 537].)

CEQA is to be interpreted broadly so as to "afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

All doubts LAFCO is a "local agency" subject to CEQA requirements were resolved by the express language of the 1975 amendment to CEQA (local) guidelines.[3] LAFCO has, by these guidelines for implementation of CEQA, determined its approval activities are subject to CEQA requirements. These guidelines do not exempt a deannexation proposition from the definition of "project." On the contrary, LAFCO's policy respecting CEQA anticipates LAFCO itself shall be the "lead agency" responsible for preparing EIRs on proposed dissolutions of cities, proposed dissolutions of special districts and on proposed detachments from special districts where the LAFCO executive officer determines after an "initial study" the proposals may have a significant effect on the environment.[4]

In compliance with these guidelines, LAFCO staff here prepared an "initial study" on the proposed deannexation and concluded it was a "project" requiring LAFCO serve as lead agency and prepare and consider an EIR before determining the matter. LAFCO's legal staff echoed these conclusions.

LAFCO and BAC seek to avoid the compelling language found in these statutes, read *in pari materia* and the clear pertinent reasoning of the *Bozung* decision, by relying upon *Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com., supra,* 51 Cal.App.3d 648. In *Simi* the appeal court rejected the contention an EIR was necessary before LAFCO approved a detachment of some 10,000 acres of underdeveloped land from the territory encompassed within a recreation and park district. It was not a "project"; therefore, there was no need for a negative declaration or an EIR. CEQA requirements were held not applicable. (*Id.,* at pp. 662-666.) This result derived from *Simi's* distinguishing *Bozung* stating: "The [*Bozung*] decision, therefore, does not make every LAFCO approval a project subject to CEQA; nor does it make every LAFCO approval of local agency boundary changes, the timing of which may coincide with intended development, such a project. It dealt only with the situation where LAFCO approval was a necessary step in the development and in effect constituted an entitlement for use for such development." (*Id.,* at p. 665.) And further distinguished its factual

---

[3]LAFCO's local "guidelines" for implementing CEQA (adopted pursuant to Pub. Resources Code, § 21082) define the term "project" to include: "An activity proposed by a person which, in order to be undertaken by a public agency, must have been approved by LAFCO, hereinafter referred to as 'Public Projects.' An example of a public project is an annexation of territory to a city or district." (P. 5 of the "guidelines.")

[4]See San Diego LAFCO Policy adopted May 13, 1974.

situation saying: "The detachment proceedings in this case constituted activities of both LAFCO and of respondent Board. However, no facts alleged or otherwise shown suggest that the availability of the property in the detached area for development in any respect depends upon the detachment. Petitioners have merely claimed that the action was taken 'just as development is starting to take place or can be expected to take place in the area proposed for detachment.' This allegation, however, is far from an allegation that the proposed development was dependent upon the detachment; it is clear that the contrary was true. Unlike the situation in *Bozung* (where the annexation removed the property from the zoning authority of the county which blocked development into the City of Camarillo which had prezoned it so as to permit the development), detachment in this case did not make any change whatever in the uses to which the land might be put. *The property was within the zoning jurisdiction of the county, both before and after the detachment,* and the land use therein permitted by the county was 'open space or agriculture.' Moreover, petitioner District had no authority over the use of the land in the detached area by virtue of its inclusion in such district, its powers being limited to those enumerated in Public Resources Code section 5782.2." (Italics added; *id.* at pp. 665-666.)

*Simi* is not factually in point. There LAFCO was not faced with a proposed detachment that would involve a choice between two competing general plans or zoning schemes for the area sought to be deannexed. In *Simi* the Ventura County general plan, and specifically the Moorpark Community Plan had already determined present and future land use and the public services to be required. These matters were not to be affected by LAFCO's action on the detachment petition.

 On the contrary, here there are competing zoning and land use plans contemplated for the 25-square-mile area. This new planning, new zoning, new land use, in reasonable probability, would not occur unless deannexation is permitted. Further, here, as the trial court found, deannexation would result in the termination of some public services currently being provided by the City of San Diego. Deannexation would interrupt police, fire, sewage, and disposal services, street development and urban planning. These services are related directly and would follow upon the proposed governmental change. Such disruption would have a possible adverse substantial impact upon both the physical and human environment.

We conclude *Simi* is not applicable authority. The statutory directive to LAFCO, as interpreted in *Bozung,* is in point and controlling and compels the conclusion the deannexation proposal here, is a project subject to CEQA and EIR requirements.

LAFCO and BAC have a second line of defense. If the proposed deannexation is a "project," it is exempt from CEQA and EIR requirements because the application for deannexation is "[t]he submittal of proposals to a vote of the people of the State or of a particular community." (Tit. 14, Cal. Admin. Code, § 15037, subd. (b)(4).) The "project" here is more than the "submittal of proposals to a vote of the people." Rather, it is but the first step required by statute on a deannexation proposal with consequent substantial impact on the physical and human environment. A deannexation proposal requires voter approval only after initial decision by LAFCO and LAFCO approval. If LAFCO disapproves the deannexation proposal, it cannot come to a vote.

It is true the deannexation petition, similar to a conditional use permit, or a petition for annexation, does not directly affect the environment. It is but a step in a series of activities that may or may not occur; but these activities may culminate in a project which will change and affect the environment. Again, *Bozung* reasoning is most pertinent: "The notion that the project itself must directly have such an effect was effectively scotched in *Friends of Mammoth.* The granting of a conditional use permit—a piece of paper—does not directly affect the environment any more than an annexation approval—another piece of paper. *Friends of Mammoth,* of course, said that the word ' "project" appears to emphasize activities *culminating* in physical changes to the environment, . . .' [Citation.] In response to that concept, the Guidelines refer to 'physical impact on the environment, directly or *ultimately.*' " (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 279.) The fact the "city eventually may not use the entitlement by not annexing, does not retroactively turn a project into a nonproject." (*Id.,* at p. 279.)

We conclude the exemption found in section 15037, subdivisions (b)(4) and (c) has no application in light of the express statutory delegation and duties to LAFCO to make its decision on such project. Where there is a reasonable possibility a project or activity may have a significant effect on the environment, an exemption would be improper. (*Wildlife Alive* v. *Chickering, supra,* 18 Cal.3d 190, 206.) We conclude a petition for

deannexation is a project which does not fall within the specified exemptions although one step in the entire process requires submittal of the deannexation question to the voters of the County of San Diego.

■ This conclusion does not end our task for the third question remains whether the "project" "may have a significant effect on the environment." (Pub. Resources Code, § 21151; Cal. Admin. Code, tit. 14, § 15060.) LAFCO has determined it has no significant effect on the environment. Therefore no EIR was necessary. The LAFCO staff here, as required by California Administrative Code, title 14, section 15080, undertook the threshold study (initial study) and determined the project would have a substantial effect on the environment, that an EIR was required and LAFCO was a lead agency for its preparation. As noted, LAFCO refused to accept these staff findings and based its exclusion on section 15037, subdivision (b)(4).

The trial court found no substantial evidence to support LAFCO's conclusion and in so doing gave the book and page as to the evidence of environmental impact which would require LAFCO to prepare an EIR. The trial court found upon completion, deannexation would result in significant effect on the environment in (a) termination of certain public services currently being provided by the City of San Diego; (b) a change of responsible public authority for sewage disposal and urban planning; (c) a substantial reduction of the level of governmental services; (d) the deannexation area would have to attempt to annex to existing governmental agencies or form new ones to replace the services not being performed by the County of San Diego; (e) the area contained within the proposed deannexation includes most of the Tijuana River floodplain and contains open space and agricultural resources. Land use activities within the area could well have impact on the Tijuana River Salt Marsh, the last remaining salt water marsh of any significance in southern California; (f) the application expressly declares the 1966 border area plan is to serve as the guiding land use document for the area. This plan envisions a concrete-lined flood control channel in the Tijuana River Valley, conversion of the salt marsh into a marina and replacement of floodplain agricultural and open uses with residential, commercial and industrial development; (g) the proposal would shift the area from one local government's jurisdiction to another's; and (h) the proposal could involve two competing schemes for land use planning and zoning.

We conclude substantial evidence supports the trial court's finding and conclusion deannexation could have the potential, either directly or indirectly, for significant impact on the physical and human environment in the area.

LAFCO next asserts trial court error in finding LAFCO to be the "lead agency" within Public Resources Code section 21067 and argues it would be premature and wasteful for LAFCO to undertake the burden to prepare an EIR.

■ This same argument was made but rejected by the Supreme Court in *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 282: "The basic contention, in effect, is that an EIR at the stage of a LAFCO annexation approval is premature and wasteful, since—at least in this case—a further EIR will be required before Camarillo can actually rezone the Bell Ranch.

". . . Conceding for the sake of argument only that this is so, it misses the entire thrust of CEQA which requires governmental agencies 'at all levels' to consider environmental factors."

The Supreme Court thereupon set forth eight separate and distinct considerations which make it appropriate for LAFCO to be the lead agency in preparation of an EIR. (*Id.,* at pp. 282-286.) Each of the considerations there discussed is applicable here. LAFCO is the first governmental agency to act on the proposed deannexation. The proposal cannot be carried out without LAFCO's discretionary approval. Under the Knox-Nisbet Act, LAFCO must undertake environmental and economic studies and public services analyses—from a regional perspective—before approving the proposed deannexation. These studies can be merged successfully with an EIR and thus avoid wasteful duplication. The voters would be aided by information on the environmental, economic and government efficiency implications of the proposed deannexation. The LAFCO EIR would be available to assist the public in exercising its vote.

We conclude LAFCO is the "lead agency" under the guidelines as well as in the fact context here. There is no trial court error in so holding.

■ Finally, BAC asserts CEQA unconstitutionally infringes upon First Amendment rights in abridging freedom of speech and rights to petition

for grievance. They assert a denial of their petition would preclude their taking the issue to the voters of the people of the City of San Diego. This contention is without merit. LAFCO's duty to prepare an EIR and to approve or disapprove the deannexation proceedings arises because of the significant environmental impact of the proposal if carried out. These findings have nothing to do with political beliefs, the environmental beliefs, thoughts or expressions of BAC. It is immaterial whether LAFCO agrees or disagrees with BAC proposals. Here a change in land use may result in significant effect on the environment and this triggers a statutory duty imposed upon LAFCO.

Nor is the fee to be charged to BAC in connection with the preparation of the EIR an unconstitutional burden on First Amendment rights or an unreasonable impediment on the right to petition for redress of grievances. Such fee is rationally related to the objective of protecting the environment. It is difficult to conceive of any avenue for placing a matter on the ballot that does not have statutory requirements (impediments) first to be met. Filing fees for candidates are required to be paid. A minimum number of voters must sign petitions. There are limits on the nature of the subject matter which can be submitted to local vote units. All these limitations on access to the ballot attest to the fact the people of the State of California can and do impose rational limitations, related to a legitimate state object, on the submission of a proposal to the people via the ballot box. Here the EIR requirements are rationally related to the legislative objectives of CEQA and Knox-Nisbet; therefore the CEQA interpositions required pass constitutional muster.

Judgment affirmed.

Brown (Gerald), P.J., and Cologne, J., concurred.

A petition for a rehearing was denied May 25, 1978, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied July 5, 1978.