[Civ. No. 58244. Second Dist., Div. Five. Nov. 6, 1980.]

LEE D. PRENTISS et al., Plaintiffs and Appellants, v.
BOARD OF EDUCATION OF THE SOUTH PASADENA
UNIFIED SCHOOL DISTRICT et al., Defendants and Respondents.

COUNSEL

McDonald, Harmon & Granieri and George McDonald for Plaintiffs and Appellants.

John H. Larson, County Counsel, Leroy W. Blankenship and Frank B. Snyder, Deputy County Counsel, for Defendants and Respondents.

OPINION

MARGOLIS, J.*—Appellants are residents and taxpayers of the South Pasadena Unified School District (District). Some of the appellants are also parents of pupils enrolled at the El Centro Elementary School during the 1978-1979 school year.

Respondents are the District, its five-member board of education (Board), its superintendent of schools, its assistant superintendent—business services, and its assistant superintendent—instructional services.

---

*Assigned by the Chairperson of the Judicial Council.

Appellants Prentiss (Lee D. Prentiss and Shirley A. Prentiss) and Girvigian (Raymond Girvigian and Beverly R. Girvigian) filed their petition for writ of mandate to review negative declaration of environmental impact report. Appellants Prentiss, Girvigian and Schleppy (Arthur L. Schleppy and L. Renne Schleppy) filed their complaint for declaratory relief and for pretrial restraining orders and preliminary injunction. The trial court denied appellants' petition for a writ of mandate in the first action and a temporary restraining order and order to show cause in the second action.

Thereafter, by agreement of the parties, the two actions were tried together. This appeal is from the judgment denying the petition for writ of mandate and injunctive relief.

FACTS

The District is a public school district whose boundaries are coterminous with those of the City of South Pasadena. In its geographical area of approximately 3.47 square miles the District operated (during the years herein pertinent) five elementary schools, one junior high school and one senior high school.

During the 1978-1979 school year El Centro School had an enrollment of approximately 212 pupils in grades 1 through 6. Enrollment for the 1979-1980 school year was projected to be 172 pupils.

Lincoln School is located some five-eighths of a mile from El Centro School. Enrollment at Lincoln during the 1978-1979 school year was approximately 247 pupils in grades kindergarten through 6. Projected enrollment for the 1979-1980 school year was 217 pupils.

The Board for many years investigated and considered its utilization of elementary school facilities. During the 1972-1973 school year the Board commissioned a study to be made of the use of school property. During the 1977-1978 school year the Board appointed an ad hoc advisory committee of parents, teachers and administrators to consider and make recommendations regarding the use of El Centro and Lincoln Schools. The subject was discussed at a number of meetings attended by interested persons.

The Board considered various options including having certain grade levels for all of the children attending El Centro and Lincoln Schools at one of the schools and other grades at the other school.

For many years there has been discussion and dispute concerning the route, if any, to be taken by a freeway connector between the Long Beach and Pasadena freeways. The decision could affect the neighborhoods from which the pupils come and accessibility to the schools by foot and by automobile. As of the time of the trial construction of the freeway connector was uncertain and highly speculative as to route location, date of commencement, date of completion and source of financing.

Finally, on April 12, 1979, the Board decided to close El Centro and transfer its pupils to Lincoln effective September 1979. That action triggered this litigation.

Prior to deciding to close El Centro School the Board considered the possible effect on the environment of the closure and transfer under consideration. The superintendent met with the head of the impact analysis section of the Department of Regional Planning for the County of Los Angeles, and they discussed the proposed closure and transfer and the possible environmental factors to be considered.

After further study and discussion, including public meetings, the Board unanimously adopted at the April 12, 1979, meeting its already proposed negative declaration (Cal. Admin. Code, tit. 14, § 15083), and directed that it be filed with the county clerk. The trial court found that the adoption and filing of the negative statement was not required but done only "out of an abundance of caution." The trial court stated further that if the California Environmental Quality Act (C.E.Q.A.) were applicable the adoption and filing of the negative declaration was satisfactory compliance.

Some additional facts should be stated. El Centro School is located on approximately 2.86 acres and Lincoln School on 3.69 acres. Combined enrollment at Lincoln School for the 1979-1980 school year was projected to be 389 pupils. Average enrollment was actually 371 pupils, 18 less than projected.

After deciding to close El Centro School the Board completed contracts aggregating approximately $278,000 to rehabilitate Lincoln School, move relocatable classrooms, purchase playground equipment and resurface the asphalt playground. Lincoln School was renamed Arroyo Vista School.

At the time of the trial no decision had been made as to what to do with the empty El Centro School building. Consideration has been given to moving administrative personnel into the premises and also to leasing it to a private school.

## ISSUES

In their brief appellants state: "It is, in a word, appellants' position that the large-scale movement of elementary school children, geographically, within an area has an effect, if not on them, upon their parents, the local neighborhood where the effected [*sic*] campus is located and upon the tendency of parents, under such circumstances, to drive their children to school with the consequential effects of traffic congestion, local property evaluations, and the like, and that the plan, on a prima facie basis, does fall within C.E.Q.A."

Appellants thus argue that the Board must satisfy the requirements of C.E.Q.A. and that the adoption and filing of the negative declaration was not sufficient compliance.

Respondents assert that the actions of the Board are not a "project" within the meaning of C.E.Q.A. (§ 21080),[1] and therefore C.E.Q.A. is not applicable. Respondents urge further that if C.E.Q.A. is applicable the adoption and filing of the negative declaration was satisfactory compliance. Further, respondents assert that the closure of El Centro is exempt from C.E.Q.A. because it was an action taken to implement Proposition 13. (§ 21080, subd. (b)(9).)

## DECISION

■ We conclude that the actions of the Board are not a "project"; compliance with C.E.Q.A. is not required; the remaining issues are moot.

## DISCUSSION

Section 21080, subdivision (a), inter alia, makes C.E.Q.A. applicable to "projects proposed to be carried out or approved by public agencies."[2]

---

[1]All references to code sections are to Public Resources Code unless otherwise indicated.

[2]"Public agency" is defined in section 21063. It is not disputed that respondent District is a public agency.

"If there was no 'project' there was no occasion to prepare either a negative declaration or an EIR." (*Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 663 [124 Cal.Rptr. 635].)

In *Simi Valley* a local agency formation commission and the county board of supervisors determined to detach some 10,000 acres of undeveloped land from the territory of a recreation and park district. The district and two residents and property owners petitioned for a writ of mandate to nullify that determination. A judgment was entered dismissing the action after demurrers were sustained without leave to amend.

In affirming, this court stated: "The evaluation process contemplated by CEQA relates to the effect of proposed changes in the physical world which a public agency is about to either make, authorize or fund, not to every change of organization or personnel which may affect future determinations relating to the environment. The determinations of respondent LAFCO and of respondent Board were in the latter category and were not 'projects' which they proposed to carry out. There was, therefore, no need for a negative declaration or an EIR since neither requirement is applicable if there is no project subject to CEQA." (51 Cal.App.3d at p. 666.)

"Project" is defined generally in section 21065[3] and has been discussed in two decisions of our Supreme Court. In *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], the court held that "project" includes not only construction, acquisition or other development but also the issuance of permits, leases and other entitlements.

In *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017], a petition for a writ of mandate was sought to require LAFCO to certify an environmental impact report before approving the city's annexation of property located in an unincorporated area of Ventura County. Demurrers were sustained without leave to amend.

---

[3]"'Project' means the following: [¶] (a) Activities directly undertaken by any public agency. [¶] (b) Activities undertaken by a person which are supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

It was alleged in the complaint that the annexed area would be used for residential, commercial and recreational uses and that development was anticipated in the near future. It was apparent, the court said, that the subdivision would not proceed as long as the land was under county jurisdiction. Planning was completed, conferences with city agencies had been held, and early development was expected.

The court held that LAFCO approval of the annexation was a project. The court pointed out that it was not deciding the abstract question whether any LAFCO approval of any annexation to any city may have a significant effect on the environment. In *Bozung* the court found that the approval by LAFCO was a project (§ 21065, subds. (a) and (c)) because it "was a necessary step in the development and in effect constituted an entitlement for use for such development." (*Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com., supra*, 51 Cal.App.3d at p. 665.)

In *People* ex rel. *Younger* v. *Local Agency Formation Com.* (1978) 81 Cal.App.3d 464 [146 Cal.Rptr. 400], the court distinguished *Simi Valley* from a case in which the deannexation of some 25 square miles of land from the City of San Diego was proposed. "[H]ere there are competing zoning and land use plans contemplated for the 25-square-mile area. This new planning, new zoning, new land use, in reasonable probability, would not occur unless deannexation is permitted. Further, here, as the trial court found, deannexation would result in the termination of some public services currently being provided by the City of San Diego. Deannexation would interrupt police, fire, sewage, and disposal services, street development and urban planning. These services are related directly and would follow upon the proposed governmental change. Such disruption would have a possible adverse substantial impact upon both the physical and human environment." (81 Cal.App.3d at p. 478.) The court concluded that *Bozung* was controlling and *Simi Valley* inapplicable.

In the instant case the local agency (District) determined to close one elementary school and to transfer its pupils some five-eighths of a mile to another school. The decision was not, as in *Bozung*, a necessary step in the development of property for a new and different use nor did it portend the types of consequences that would result from the deannexation in *Younger*. Rather, the facts presented and the conclusions we have reached are controlled by and harmonious with *Simi Valley*.

Quite obviously, any future action of the respondents respecting either of the two schools involved here will have to be viewed, as to the possible applicability of C.E.Q.A., in the light of such action and the pertinent facts and circumstances.[4]

The judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

---

[4]*Plaggmier v. City of San Jose* (1980) 101 Cal.App.3d 842 [161 Cal.Rptr. 886], cited by counsel and discussed at oral argument, is inapposite.