[No. B035414. Second Dist., Div. Seven, May 5, 1989.]

EAST PENINSULA EDUCATION COUNCIL, INC., et al.,
Plaintiffs and Respondents, v.
PALOS VERDES PENINSULA UNIFIED SCHOOL DISTRICT et
al., Defendants and Appellants;
BRENTON F. GOODRICH, Intervener and Appellant.

158

COUNSEL

Ball, Hunt, Hart, Brown & Baerwitz, Charles E. Greenberg and Gary M. Baum for Defendants and Appellants.

Kronick, Moskovitz, Tiedemann & Girard, Janet K. Goldsmith and Linda S. Somers as Amici Curiae on behalf of Defendants and Appellants.

No appearance for Intervener and Appellant.

Munger, Tolles & Olson, Ronald L. Olson, Daniel P. Garcia and Stephen M. Kristovich for Plaintiffs and Respondents.

OPINION

LILLIE, P. J.—Palos Verdes Peninsula Unified School District, Board of Education of the Palos Verdes Peninsula Unified School District and Jack H. Bagdasar, Sally Burrage, Marlys J. Kinnel, Joseph Sanford and Jeffrey N. Younggren, individuals in their official capacity as school board members (hereinafter collectively referred to as the District), appeal from judgment granting motion for peremptory writ of mandate in favor of plaintiffs East Peninsula Education Council, Inc., and Thomas E. Gibbs, Jr. (hereinafter referred to as EPEC) and from peremptory writ of mandate issued by the superior court commanding the District "(1) to declare null and void the school board's November 2, 1987 vote to close Miraleste High School and to transfer all students in grades 6 through 12 from the eastside of the Palos Verdes Peninsula to the westside of the Palos Verdes Peninsula, and (2) to suspend all activity pursuant to the November 2, 1987 vote . . . that could result in any change to the environment until the School District has first analyzed the cumulative environmental effects of this and other school

closures and student transfers in compliance with the California Environmental Quality Act."

On this appeal we consider whether the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) applies to the school board's decision to close Miraleste High School and transfer its students to other schools. At issue is the interpretation of an exemption to CEQA, Public Resources Code section 21080.18, which provides that "[t]his division does not apply to the closing of any public school in which kindergarten or any of grades 1 through 12 is maintained or the transfer of students from that public school to another school if the only physical changes involved are categorically exempt under Chapter 3 (commencing with Section 15000) of Division 6 of Title 14 of the California Administrative Code."[1]

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *Events Leading to School Board Decision to Close Miraleste High School and Transfer Students*

The District, the largest single landowner on the Palos Verdes Peninsula, provides public elementary and secondary education for children living within the cities of Palos Verdes Estates, Rolling Hills, Rolling Hills Estates, and portions of Rancho Palos Verdes. Palos Verdes Peninsula is an affluent residential community where the high percentage of college-educated parents, the high educational aspirations of the students, and the high average family income have influenced the college preparatory orientation of the District's secondary schools. The majority of the students live in the middle and the northwest area of the Palos Verdes Peninsula. The geography and topography of the peninsula make travel between the east and the west side difficult; the few connecting roads are already overcrowded, with accident rates several times higher than the county average.

From a peak enrollment of 17,836 students in the 1973 to 1974 school year, enrollment declined steadily and, as of September 21, 1987, enrollment had fallen to 9,826. From 1978 to the fall of 1986, the District closed five of its thirteen elementary schools and two intermediate schools. By the fall of 1986, the District operated eight elementary schools, one prekindergarten, three intermediate schools (grades 6 through 8), three conventional

---

[1] In 1987, the California Administrative Code was renamed the California Code of Regulations. (See Gov. Code, § 11344, subd. (a).)

high schools (grades 9 through 12), and a continuation high school. For years, Miraleste High School, on the east side of the peninsula, had been kept open by boundary adjustments by which students were drawn from a larger proportion of the district to increase enrollment.

In 1986, the District undertook to update its long-range master plan and appointed a 50-member citizen's advisory committee to revise the master plan. The committee's draft plan acknowledged that the District had suffered declining enrollment and faced a financial crisis. The plan contained recommendations that for 1986-1987 the District close one high school, close or convert an intermediate school to a kindergarten through eighth grade school, depending on further study of community wishes and economics, and close one or more elementary school. The draft plan also recommended that a parcel tax election be held in March 1987 for a parcel tax of not less than three years or more than five.

In October 1986, the president of the Miraleste High School Boosters Club presented the Miraleste Unified Seven through Twelve Plan (MUST Plan) as an alternative to the proposal of the master plan committee. The MUST Plan advocated closing an intermediate school and converting Miraleste to grades seven through twelve and adding sixth grades to two elementary schools. In November 1986, the school board approved an amended plan which essentially incorporated the MUST Plan. In March 1987, the voters rejected the parcel tax. In September 1987, the board received a report from the superintendent outlining a variety of possible solutions to the fiscal crisis, including the closure of Miraleste High School and relocation of the students to the two remaining high schools, which would require 12 portable classrooms (relocatables). At that time Miraleste, with a capacity of about 1700 students, had enrolled approximately 1143 students in grades 7 through 12. The other 2 high schools then had enrolled about 1650 and 1560 students respectively. The closure of Miraleste would leave the east side of the peninsula with no intermediate or high school. In October 1987, the superintendent reported to the school board that the number of high school students in the District was then below the enrollment projections for the 1990-1991 school year and that if the trend continues, in six or seven years the District would need only one high school and one intermediate school.

After numerous public meetings, on November 2, 1987, the school board passed the following motion: "That the Board approve the closing of Miraleste High School . . . effective as of the end of the 1987-1988 school year. The transfer of the present 7 through 11th grade students from Miraleste to Palos Verdes High School and Rolling Hills High School and the assignment of present 6th grade students at Mira Catalina and Rancho Vista to

Ridgecrest Intermediate and Malaga Cove Intermediate Schools. In connection with such closings and transfers [we] find that the closing of Miraleste High and the reassignment of students to the receptor schools are exempt from California Environmental Quality Act compliance pursuant to Section 21080.18 of the California Public Resources Code, in that the closing and transfer will require only minor physical changes to the receptor schools which qualify for categorical exemption under Section 15314 of the [CEQA] guidelines Section 14 California Administrative Code section 15000 et seq."

The board chairman pointed out that the motion contemplated sending the present Miraleste seventh graders to the receiving high school rather than an intermediate school so that they would not have to make one more move at the end of eighth grade to a high school. The superintendent stated that although the recommendation was that the seventh graders go to the high schools, if parents prefer, seventh graders would be given the option to attend an intermediate school.

B. *Petition[2] for Writ of Mandate and Ruling Thereon*

Plaintiffs filed a first amended complaint against defendants to enjoin waste of public funds, to enjoin violation of constitutional rights and for declaratory relief, and petition for writ of mandate for violation of CEQA. Thereafter plaintiffs filed motion for peremptory writ of mandate seeking to command District and the school board to declare the November 2, 1987, vote null and void for failure to comply with CEQA and to prepare an environmental impact report prior to making any new decision to close Miraleste High School and to transfer students to westside schools.[3]

After hearing, the trial court granted the motion for peremptory writ of mandate and judgment was entered thereon. A peremptory writ of mandate was issued commanding defendants to declare null and void the school board's November 2, 1987, vote to close Miraleste and transfer students and

[2]Although plaintiffs also filed a "motion" for peremptory writ of mandate, and it is this motion which the court granted, we deem this ruling also to grant the petition for writ of mandate.

[3]Plaintiffs also filed motion for preliminary injunction to enjoin an alleged waste of public funds and an alleged fraudulent and collusive use of public funds. They also claimed that the District's decision violated their federal and state constitutional right to associate and to vote in that the District's decision to close Miraleste and potential sale of the property would in effect deny plaintiffs their right to associate for the purpose of voting on a new east side school district. Having been incorporated two days after the November 2 vote, EPEC was organized for the purpose of promoting and assisting in the formation of a new school district for the eastside of the peninsula. The court denied the motion for preliminary injunction and no appeal was taken from such order of denial. Although these issues are not pertinent to this appeal, we mention them briefly to provide a more detailed picture of the plaintiffs' motivations and the political setting of the instant case.

to suspend all activity pursuant to such vote until the District has first analyzed the cumulative environmental effects of this and other school closures and transfers in compliance with CEQA. Defendants filed return to peremptory writ of mandate in which they stated they were appealing from the judgment and pending such appeal they would suspend taking any further steps to close Miraleste.

Defendants and intervener Brenton F. Goodrich filed notices of appeal.[4] In July 1988 the District filed in this court petition for writ of supersedeas and/or other appropriate relief. On July 14, 1988, we denied the petition for writ of supersedeas, stating that the relief granted by the superior court is prohibitory in nature and the judgment is not automatically stayed by the appeal. Thus, pending the instant appeal, Miraleste has remained open.

II

TRIAL COURT PROPERLY INTERPRETED PUBLIC RESOURCES CODE
SECTION 21080.18

A. *Appellants' Contentions and Standard of Review*

Before we discuss appellants' contentions, it is important to remember that the trial court's decision does not require appellants to prepare an environmental impact report (EIR). Rather, the trial court's decision was that District did not properly evaluate whether its proposed action was exempt from CEQA, a step preliminary to a determination of whether an EIR is required. " ' "[I]n CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to 'Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.' (Pub. Resources Code, § 21001, subd. (d).) To achieve these objectives, CEQA and the guidelines issued by the State Resources Agency to implement CEQA establish a three-tiered structure. If a project falls within a category exempt by administrative regulation . . ., or 'it can be seen with certainty that the activity in question will not have a significant effect on the environment' . . ., no further agency evaluation is required. If there is a possibility that the project may have a significant effect, the agency undertakes an initial threshold study . . .; if that study demonstrates that the project 'will not have a significant effect,' the agency may so declare in a brief Negative Declaration. . . . If the project is one 'which may have a significant effect on the environment,' an EIR is

---

[4] Although intervener filed a notice of appeal, he has not filed an opening brief. Henceforth, references to appellants will exclude intervener.

required." ' [Citation.]" (*City of South Gate* v. *Los Angeles Unified School Dist.* (1986) 184 Cal.App.3d 1416, 1423 [229 Cal.Rptr. 568].)

 Appellants contend the trial court erred in interpreting Public Resources Code section 21080.18 as creating a cumulative impact exception to the exemption to CEQA for transfers of students from closed schools. Section 21080.18 provides: "This division [CEQA] does not apply to the closing of any public school in which kindergarten or any of grades 1 through 12 is maintained or the transfer of students from that public school to another school if the only physical changes involved are categorically exempt under Chapter 3 (commencing with Section 15000) of Division 6 of Title 14 of the California Administrative Code."

Title 14 contains guidelines (Guidelines [for convenience, the word "subdivision" is omitted when citing the Guidelines]) developed by the State Office of Planning and Research and adopted by the Secretary of the Resources Agency "for the implementation of [CEQA] by public agencies." (Pub. Resources Code, § 21083.) Guidelines section 15354 defines "categorical exemption" as an exemption from CEQA for a class of projects based on a finding by the Secretary for Resources that the class of projects does not have a significant effect on the environment. Guidelines sections 15301 through 15329 contain 29 classes of categorical exemptions. Section 15314 states that "Class 14 consists of minor additions to existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, whichever is less. The addition of portable classrooms is included in this exemption."

Guidelines section 15300.2 contains exceptions to categorical exemptions. Subdivision (b) of this section states: "Cumulative Impact. All exemptions for these classes [of categorical exemptions] are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant—for example, annual additions to an existing building under Class 1." Subdivision (c) of this section states: "Significant effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."

The principal issue on appeal is whether, as to transfers of students from closed schools, the language in Public Resources Code section 21080.18 pertaining to "physical changes . . . [that] are categorically exempt under Chapter 3 . . . of Division 6 of Title 14 of the California Administrative Code" should be read, as read by the trial court, as incorporating the exceptions to the categorical exemptions set out in Guideline section 15300.2, or whether such language incorporates only the limitations in Guideline section 15314 (increase in school capacity of 25 percent or 10

classrooms), as contended by appellants. In other words, the question is whether the words "physical changes" refer to all physical changes caused by the transfer, including the cumulative impacts of the transfer and related past and reasonably foreseeable future closings and transfers, or only to specified physical changes at the receptor schools. ■■ ■ ■ ■ Appellants maintain that case law on school closures and transfers and legislative history support the latter interpretation.[5]

Public Resources Code section 21168.5 provides that where no administrative hearing is required, as in the case at bar, judicial review "shall extend only to whether there was a prejudicial abuse of discretion," which is established "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." ■ An agency's use of an erroneous legal standard constitutes a failure to proceed in a manner required by law. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 88 [118 Cal.Rptr. 34, 529 P.2d 66].) ■ The interpretation and applicability of a statute is a question of law requiring an independent determination by the reviewing court. (*Sher* v. *Leiderman* (1986) 181 Cal.App.3d 867, 881 [226 Cal.Rptr. 698].)

## B. *Principles of Statutory Construction*

■ "The primary rule of statutory construction is that the courts should attempt to ascertain the intent of the Legislature and construe a statute so as to effectuate its purpose." (*People* v. *Superior Court (Arthur R.)* (1988)

---

[5]Appellants point out that according to a flowchart in appendix A to the CEQA Guidelines the first analytical step is for the agency to determine whether the activity is a "project" under CEQA and the next step is for the agency to determine the applicability of any exemptions. Appellants claim that Guidelines section 15378(b)(5) provides an independent method of analysis to exempt school closings and transfers as not constituting "projects" under CEQA. They maintain that the trial court erred in applying Guidelines section 15378(b), which states: "Project does not include: . . . [¶] (5) The closing of a public school and the transfer of students to another school where the only physical changes involved are categorically exempt. . . ." This issue also requires us to determine whether the language of Guidelines section 15378(b)(5), substantially similar to the language of section 21080.18, incorporates the exceptions to the categorical exemptions. Thus, the question of whether the closure of Miraleste and transfer of students is a project subject to CEQA and the question of whether such action is statutorily exempt from CEQA under Public Resources Code section 21080.18 involve the same analysis of the scope of language pertaining to "physical changes" that are "categorically exempt." In this case, for all practical purposes, the two concepts merge. Moreover, because administrative regulations which alter or amend the statute or enlarge or impair its scope are void (see *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [241 Cal.Rptr. 67, 743 P.2d 1323]), we would be compelled to consider the statute as controlling to the extent that it conflicted with Guidelines section 15378(b)(5). We therefore find without merit appellants' contention that Guidelines section 15378(b)(5) provides an independent ground to exclude from CEQA the decision to close Miraleste and transfer students on the theory that it is not a "project" subject to CEQA.

199 Cal.App.3d 494, 498 [244 Cal.Rptr. 841].) ■ When statutory language is clear and unambiguous, there is no need for construction, and courts should not indulge in it. (*City of Pomona* v. *Superior Court* (1986) 182 Cal.App.3d 1093, 1099 [227 Cal.Rptr. 714].) ■ Despite the general rule that ambiguity is a condition precedent to interpretation, the literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in light of the statute's legislative history, appear from its provisions considered as a whole. (*California Insurance Guarantee Assn.* v. *Liemsakul* (1987) 193 Cal.App.3d 433, 439 [238 Cal.Rptr. 346].) "Unless defendants can demonstrate that the natural and customary import of the statute's language is either 'repugnant to the general purview of the act,' or for some other compelling reason, should be disregarded, this court must give effect to the statute's 'plain meaning.' [Citation.]" (*Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 218-219 [188 Cal.Rptr. 115, 655 P.2d 317].)

■ "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 . . . .)" (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].) ■ "Exceptions to the general rule of a statute are to be strictly construed." (*Barnes* v. *Chamberlain* (1983) 147 Cal.App.3d 762, 767 [195 Cal.Rptr. 417].)

■ The literal terms of Public Resources Code section 21080.18 require that for the transfer of students to be exempt from CEQA, the physical changes must be categorically exempt under *all* of the provisions of chapter 3 of division 6 of title 14 of the California Code of Regulations, which includes the exceptions to the categorical exemptions set out in Guidelines section 15300.2. Appellants contend that the legislative history reveals an intent to incorporate into the statute only the limitations of Guidelines section 15314, pertaining to an increase in students or classrooms at the receptor school. Having granted appellants' request for judicial notice of the legislative history of section 21080.18, we have considered the same. We conclude that at best it is inconclusive, giving rise to conflicting inferences, and thus does not justify departing from the plain language of the statute. (See *People* v. *Boyd* (1979) 24 Cal.3d 285, 295 [155 Cal.Rptr. 367, 594 P.2d 484].)

C. *Legislative History*

As originally enacted in 1984, Public Resources Code section 21080.18 provided that "This division shall not apply to the closing of any public

school in which kindergarten or any of grades 1 through 12 is maintained." Prior to the enactment of the statute two courts had addressed the issue of whether school closings were subject to CEQA. In *Prentiss* v. *Board of Education* (1980) 111 Cal.App.3d 847 [169 Cal.Rptr. 5], the court held that the actions of the board of education in closing an elementary school and the transfer of students was not a "project" within the meaning of CEQA because the "decision was not, as in *Bozung* [v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263], a necessary step in the development of property for a new and different use nor did it portend the types of consequences that would result from the deannexation in [*People* ex rel. *Younger* v. *Local Agency Formation Com.* (1978) 81 Cal.App.3d 464]." (111 Cal.App.3d at p. 853.)

In *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779 [187 Cal.Rptr. 398, 654 P.2d 168], the court held that the State Board of Education violated CEQA by failing to conduct an initial environmental study of the necessity for an environmental impact report before it approved a plan for a portion of a school district to secede from an existing district and form a new district. (*Id.,* at pp. 794, 798.) In a footnote, the court in *Fullerton* stated: "The decision in *Prentiss* . . . that the closure of a school is not a 'project' because the school board had not decided whether to put the land to a different use, is questionable. It may be unlikely that the closure of a single elementary school would have a significant environmental impact apart from its effect on the use of the property—the school board in *Prentiss* filed a negative declaration—but the possibility cannot be rejected categorically." (32 Cal.3d at p. 796, fn. 16.)

Legislative history indicates that the bill to add section 21080.18 to the Public Resources Code was introduced by Senator Paul Carpenter in 1984 to facilitate the closing of a school in his district. While Senate Bill No. 1355 at one time would have exempted both school closings and reorganization of school districts, the Assembly amended the bill to delete reorganizations, and the Senate concurred in the Assembly's amendment. The bill was opposed by the Governor's Office of Planning and Research and the Resources Agency. A June 22, 1984, letter from the Director of the Office of Planning and Research to the chairman and members of the Assembly Natural Resources Committee and Senator Carpenter states that "While it is possible that certain school closures may not produce significant effects on the environment, other activities such as busing, bus schedules, and traffic circulation associated with the construction, expansion or closure of existing schools may create significant adverse environmental effects. . . . [¶] [C]urrently, where the closure of a school will not result in a significant effect on the environment, a negative declaration may be prepared. This would eliminate the need for an EIR. [¶] Further, under current law, a

public agency may request the addition of a class of projects to the list of categorical exemptions in the CEQA Guidelines. We believe this process is preferable to the blanket exemption provided for in SB 1355."

In February 1986, Senator Carpenter introduced Senate Bill No. 2305, sponsored by the California School Boards Association, to amend section 21080.18. Although the documents supplied by the Legislative Intent Service which we have been requested to, and do, judicially notice, do not contain the language of the bill as introduced, a staff analysis of Senate Bill No. 2305 by the Senate Committee on Education states that the bill exempts a school district from EIR requirements of CEQA if the district transfers students from one school to another. As background, the staff analysis notes that "Current law exempts school districts from the EIR requirements if a district closes a school. At least one Superior Court has held that the transfer of students is also exempt from an EIR, but the California School Boards Association (CSBA) feels the statute needs explicit clarification to avoid unnecessary law suits in the future."

The Resources Agency bill analysis, dated April 7, 1986, opposed the bill, noting that the bill would permit significant environmental effects "by exempting from analysis under CEQA all transfers of students from closures of public schools . . ., providing no limit to or consideration for the following factors: (1) the number of students so transferred; (2) the manner of and distance over which the transfer occurs; and (3) the facilities receiving the transferred students." On May 1, 1986, the bill went to the Assembly where it was sent to the Committee on Natural Resources. The Assembly Natural Resources Committee digest of the original version of the bill noted the position of the Resources Agency and stated "the author may wish to consider a technical amendment . . . to conform the bill to Section 15314 of the CEQA Guidelines, pertaining to categorical exemptions. This would allow student transfers resulting from public school closures to be exempt from CEQA, provided that 'such transfers do not increase student capacity at an existing school by more than 25% or ten classrooms, whichever is less' ".

On June 30, 1986, the bill was amended and re-referred to the Assembly Natural Resources Committee. The Assembly Natural Resources Committee digest of the amended version of the bill describes the amended version as extending "the existing CEQA exemption for public school closures to include transfers of students from such schools where the only physical changes involved are already categorically exempt." The bill, as amended, was passed by the Assembly and then the Senate.

Appellants acknowledge that the legislative history does not clearly reveal why the wording of Guidelines section 15314, as suggested by the

Resource Agency, was not set forth in the statute. Appellants suggest that "[t]he most likely explanation is that the Legislature did not want to foreclose a school district from invoking other categorical exemptions which might apply in a closure or transfer situation, e.g., Guidelines section 15301 (exemption for repair, maintenance or minor alterations to existing structures) and Guidelines section 15302(replacement or reconstruction of existing structure with substantially the same capacity.)" This same reasoning, however, leads to the conclusion that in amending Public Resources Code section 21080.18 the Legislature did not want to exclude a consideration of cumulative effects set out in Guidelines section 15300.2 from an agency's determination of whether a transfer of students is categorically exempt. As pointed out by respondents, the simple explanation for the failure of the statutory language to mirror the language of Guidelines section 15314 is that if the Legislature had intended to limit the considerations involved in determining whether a transfer was exempt from CEQA to those set out in section 15314, it would have said so.

As evidence of legislative intent, appellants also rely on the sponsor's motivation and arguments in support of the proposed 1986 amendment to the statute. The proponents of the bill wanted to codify an interpretation of the statute (former Pub. Resources Code, § 21080.18) by the Los Angeles County Superior Court so that student transfers, the logical by-product of the school closing, would also be exempt from CEQA. However, the original version of the bill was not the one that became law. Moreover, because in construing legislation a court does not consider the motives or understanding of individual legislators (*No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 248 [242 Cal.Rptr. 37]), we should not consider the motives or understanding of nonlegislators who sponsored or supported the instant legislation, particularly where, as here, the statute was not enacted as originally proposed.

 It is unclear whether appellants rely upon the case of *City of South Gate* v. *Los Angeles Unified School Dist., supra,* 184 Cal.App.3d 1416 to illuminate legislative intent with respect to section 21080.18, or only to support their contention, which we find to be without merit (see *ante,* fn. 5) that Guidelines section 15378(b)(5) provides an independent basis to exclude from CEQA the closure of Miraleste and transfer of students on the ground that the action was not a "project" subject to CEQA.

The opinion in *City of South Gate* was filed on August 28, 1986, two days after the State Senate had concurred in the Assembly amendments to Senate Bill No. 2305. In *City of South Gate* the court found that an environmental impact report was not required for a pupil attendance boundary adjustment involving the phased-in transfer of about 600 students, where there was no

construction of new or additional facilities and where the capacity of the receiving school was not exceeded by 25 percent. The court held that the boundary adjustment was not a project pursuant to Guidelines section 15378(b)(5), (184 Cal.App.3d at pp. 1424-1425), and that the boundary adjustment was excluded under Public Resources Code former section 21080.18. (*Id.,* at pp. 1425-1426.) In construing former section 21080.18, the court stated that "[the trial court] reasoned that the mere transfer of students from one school to another by a boundary adjustment is of lesser impact than a closure of an entire school, and therefore, because 'the greater included the lesser,' section 21080.18 must of necessity exclude the transfer of students. We find the trial court's interpretation reasonable." (*Id.,* at p. 1425.)

The *City of South Gate* decision was not brought to the attention of the Legislature in amending section 21080.18, and thus is not properly considered as part of the historical background of the statute. Nor did that case deal with the issue of cumulative impacts. We think it clear that *City of South Gate* does not support appellants' contentions herein.

We thus conclude that appellants have not met the burden of showing that legislative history evidences a purpose or intent other than that expressed by the literal meaning of the statutory language.

D. *Interpretation Does Not Lead to Mischief or Absurdity*

Amicus curiae California School Boards Association, which filed a brief in support of appellants, claims that the trial court's interpretation of Public Resources Code section 21080.18 renders it meaningless surplusage because it replaces the statutory exemption with the Guidelines pertaining to categorical exemptions, which would have applied in the absence of any legislation at all. Amicus also asserts that the "replacement" of the statutory exemption with the categorical exemption is repugnant to some overall statutory framework pursuant to which statutory exemptions "are based on social and policy considerations entirely unrelated to environmental concerns, and are therefore not normally subject to 'exceptions' based on those concerns. [¶] By contrast, categorical exemptions are limited to actions which have no impact on the environment. They are based on required administrative findings to that effect."

No statute or other authority has been brought to our attention which would prohibit the Legislature from incorporating into a statutory exemption the standards set out in the categorical exemptions. Moreover, the trial court's interpretation of the statute does not render it meaningless. Rather, it is reasonable to assume that in enacting statutory language in line with

suggestions by the Resources Agency, the Legislature intended to reject an unlimited exemption for transfers of students from closed schools. Also being aware that at least one superior court had interpreted the 1984 version of section 21080.18 to include transfers of students in connection with a school closing, the Legislature, in order to make clear its rejection of such a broad exemption, added the language pertaining to transfers.

Appellants make a superficially appealing argument that a detailed analysis of cumulative impacts at the preliminary review stage of analysis when it is determined whether an activity is exempt from CEQA "places the cart before the horse by subjecting an activity to CEQA principles before it is determined that the activity is subject [to CEQA]." In other words, appellants suggest it is absurd to perform a thorough environmental analysis simply to determine whether an activity is subject to CEQA in the first instance. This result is not absurd when we consider the principles that a statutory exemption such as section 21080.18 should be strictly construed (see *Verdugo Woodlands Homeowners etc. Assn. City of Glendale* (1986) 179 Cal.App.3d 696, 702 [224 Cal.Rptr. 903]), and that such strict construction allows CEQA to be interpreted " 'in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 390.) Moreover, because the statute specifically incorporates the Guidelines pertaining to categorical exemptions, the philosophy and policies underlying the categorical exemptions should be paramount. Categorical exemptions require a specific finding by the secretary of the Resources Agency that the class of projects does not have a significant effect on the environment. (Pub. Resources Code, §§ 21084, subd. (a), 21083.) As one court has noted, "where there is substantial evidence of an adverse impact on the environment surrounding a proposed project, it would be an exaltation of form over substance to grant [a categorical] exemption because of mere technical compliance with prescribed criteria." (*Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 843 [171 Cal.Rptr. 753]; see also Guidelines section 15300.2(d) [exception to categorical exemptions for activity with significant effect due to unusual circumstances].) Thus, it is not unreasonable to require a consideration of the issue of significant environmental effects at the preliminary review stage (see Guidelines, § 15061, captioned "Review for Exemption") when the agency assesses the applicability of a categorical exemption.[6]

---

[6] Guidelines section 15382 defines "significant effect on the environment" as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to

Nor is it unreasonable under CEQA to require a school board to consider the issues of significant effects and cumulative impacts in its assessment of whether a transfer of students is exempt from the act. " 'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.) The individual effects may be changes resulting from a single project or a number of separate projects. (*Id.*, § 15355(a).) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. (*Id.*, § 15355(b).) Thus, cumulative impacts from the closing of a school and transfer of students may encompass impacts on traffic and circulation patterns, housing patterns, recreational and cultural activities, as well as "successive projects of the same type in the same place, over time" (Guidelines, § 15300.2(b)), where such impacts are significant.

Under the circumstances of the instant case, it is clear that the school board and superintendent were aware of numerous impacts on the environment attendant on the closing of Miraleste and transfer of students yet did not undertake further study and analysis of those impacts to determine if they would result in *significant* effects on the environment. The public hearings are replete with references to the already overcrowded streets, the high accident rate on some of the major streets on the peninsula, and to a parking problem at all three of the high schools, to which a large number of students drive or are driven. Several school board members suggested further study of the traffic problem and also consideration of the use of school buses, which the District then did not provide.

It is also clear from the administrative record that the superintendent and the school board recognized that if the current enrollment trend continued, within about six or seven years the District would be forced to close another high school and an intermediate school. In light of this reality, and the larger capacity of Rolling Hills High School over both Miraleste and Palos Verdes High School, the superintendent recommended keeping Rolling Hills open because it would be the most viable site for a future single high school. The superintendent envisioned Palos Verdes High School as the site for the single intermediate school. The result of the past and reasonably probable future school closing would thus be that all of the District's sixth through eighth graders would have to travel to the extreme western boundary of the District. The high school students would be traveling from both east and west to the centrally located Rolling Hills High.

a physical change may be considered in determining whether the physical change is significant."

The result of appellants' interpretation of Public Resources Code section 21080.18 is that study and analysis of the above factors are not mandated, so such study may not even be undertaken, let alone completed. While appellants in the instant case are to be commended for seeking out traffic studies and for addressing that problem as well as others, it is clear that no further analysis was performed and no determination was ever made as to whether the above impacts are environmentally *significant*. Therefore, significant environmental effects would not have been identified or mitigated.

Our interpretation of the statute, on the other hand, leads to a consideration of whether any impacts are significant, and if so, further study as to whether such effects can be mitigated will be undertaken. We recognize that our interpretation of section 21080.18 leads to a situation where the amount of analysis and study involved at the preliminary review stage of determination of whether a project is exempt from CEQA may be similar to that involved at the "second" stage where the agency conducts an initial study to determine whether the project has a significant effect on the environment (Guidelines, § 15002(k)). However, such result is mandated by the statutory language and does not appear to be repugnant to legislative policy. "[I]t is the policy of the state that public agencies should not approve projects as proposed if there are . . . feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. . . ." (Pub. Resources Code, § 21002.) Appellants have not met the burden of demonstrating a reason to depart from the plain language of section 21080.18, which requires an agency to consider the issue of significant effects and cumulative impacts of a transfer of students from a closed school in determining whether the project is exempt from CEQA under that statute.

Appellants claim that the 1986 amendment to section 21080.18 does not change the unqualified prior exemption for school *closures*. We need not address the issue of whether the language of the statute beginning "if the only physical changes involved . . . ," applies to the closing of a public school as well as to the transfer of students from a closed school to another school. This case does not involve *only* a school closing, but the transfer of students from the closed school to other schools. Thus, it is irrelevant to this case whether school closures remain unqualifiedly exempt under section 21080.18.

We now address the issue of whether the District abused its discretion.

## III

### ABUSE OF DISCRETION

"In granting an exemption, the agency must proceed in the manner prescribed by law, lest it be charged with abusing its discretion. (Pub. Resources Code, §§ 21168, 21168.5.) That law consists of CEQA statutes, the Guidelines, and the judicial gloss on both. Only with a considered awareness of the purposes and policy behind this law, and a careful analysis of the proposed project, can an agency apply an exemption to a specific project which appears to meet the exemption criteria." (*Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d 827, 842-843.) ▋ "[T]he conventional 'harmless error' standard has no application when an agency has failed to proceed as required by the CEQA." (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 897-898 [236 Cal.Rptr. 794].) Where the failure to comply with the law results in a subversion of the purposes of CEQA by omitting information from the environmental review process, the error is prejudicial. (*Rural Landowners Assn. v. City Counsel* (1983) 143 Cal.App.3d 1013, 1023 [192 Cal.Rptr. 325].)

▋ In the present case, the board used an incorrect legal standard in determining that the closing of Miraleste and reassignment of students was exempt from CEQA because the Board considered only the physical changes to the receptor schools set out in Guidelines section 15314. Such failure to comply with CEQA is prejudicial because meaningful information and analysis of cumulative effects and significant environmental effects not occurring at the receptor schools were omitted from the environmental review process.

In light of the above determination, we do not need to address respondents' contention that the school board's perfunctory conclusion that its decision satisfied the requirements of Guidelines section 15314 (i.e., no increase in student capacity by more than 25 percent or 10 classrooms, whichever is less), is not supported by substantial evidence. Were we to address this issue, however, we would find respondents' argument compelling, for the reason that the school district's decision did not direct the Miraleste students to any particular receiving school, but apparently allowed them to elect the school they were to attend, thus making it impossible for the District to properly determine compliance with section 15314.

According to the District's enrollment projections prepared in March 1987, if all of the 153 east side sixth graders from Mira Catalina and Rancho Vista elementary schools, as well as 120 seventh graders from

Miraleste were to go to Ridgecrest (one of the two intermediate schools), which was expected to have a 1988-1989 enrollment of 969, Ridgecrest would then have a total of 1242 students. As the capacity of Ridgecrest is only about 1050 students, the decision could result in the overcrowding of Ridgecrest. The influx of new students may exceed the previous enrollment at Ridgecrest by more than 25 percent. Further, if more than 400 of the approximately 850 Miraleste High School students elected to go to Palos Verdes High School, which was projected to have an enrollment of 1600, its enrollment would also be increased by more than 25 percent. Further, as a portable classroom accommodates 30 to 35 students, if all Miraleste students elected to go to Palos Verdes, more than 10 relocatable classrooms would be needed.

In their reply brief, appellants concede that student transfer assignments were not part of the board's November 2, 1987, decision. Appellants claim, however, that EPEC's substantial evidence argument is disingenuous. Appellants point out that the board concluded that if it closed Miraleste it would need to purchase an aggregate of 10 portable classrooms dispersed among the 2 intermediate schools and 2 high schools; as a practical matter it would be virtually impossible to place more than 10 portables on any 1 of the sites. Appellants also point out that by the time the student survey had been completed and transfer assignments actually made, only five relocatable classrooms were required at one intermediate school.

However, these determinations were made *after* the November 2, 1987, decision. ■ Fortuitous future events that cause a project to meet the exemption criteria, even though as envisioned at the time of its approval the project may not have met such criteria, should not be permitted to excuse noncompliance. Nor should such future events be considered as part of the substantial evidence standard. Such consideration encourages agencies to indulge in noncompliance with CEQA and then to gamble on future events to validate a decision. As one court noted, " '[t]o permit an agency to ignore its duties . . . with impunity because we have serious doubts that its ultimate decision will be affected by compliance would subvert the very purposes of the Act.' " (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 81.)

IV

EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ Appellants maintain that EPEC failed to exhaust its administrative remedies. Although appellants acknowledge that EPEC was not incorporated prior to the hearing on November 2, 1987, appellants claim that

respondent Gibbs, EPEC's incorporator and corporate secretary, had not sufficiently raised the issue of cumulative effects so as to satisfy Public Resources Code section 21177, or to bring EPEC within Public Resources Code section 21177, subdivision (c), allowing an organization formed after the approval of a project to maintain an action if a member of that organization has complied with subdivision (b). Subdivision (b) states that "[n]o person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing."

In the instant case, Gibbs sent an 11-page letter to the president of the school board on October 22, 1987, wherein he wrote: "Have you prepared an Environmental Impact Report? Due to the increased traffic and smog, etc., isn't this legally required?" At a school board meeting on October 12, 1987, Peter Gardiner, soon to become an EPEC director, criticized the limited criteria which the school board set out to guide its decision as to which school consolidation option to select (i.e., program improvement, dollar savings, grade configuration, demographics and more efficient use of facilities), and stated "I think what you need to do is look at a long term solid based analysis that projects the impacts in the long term." Gardiner also said that the Board should welcome all input about what factors are important and should not arbitrarily restrict them to five or six.

At the same board meeting, Pat Perrin, an EPEC advisory board member, criticized the criteria because "nowhere have you mentioned in your criteria the most basic concern of many Peninsula parents and that is traffic and safety."

Relying on *Coalition for Student Action* v. *City of Fullerton* (1984) 153 Cal.App.3d 1194 [200 Cal.Rptr. 855], appellants claim that the specific issue of cumulative impacts raised by plaintiffs in the trial court was not raised at the administrative level. *Coalition for Student Action* states that more is required to exhaust administrative remedies than generalized environmental criticisms at public hearings: "It is difficult to imagine any derogatory statement about a land use project which does not implicate the environment somehow." (153 Cal.App.3d at p. 1197.)

We conclude that the comments set out above, as well as other similar comments in the administrative record, were sufficient to alert appellants to the issue raised in the trial court because the board was alerted to the fact that its method of analysis was faulty and should be expanded to include analysis of long-term impacts, traffic and safety. The fact that the above comments do not refer to specific statutory language is not dispositive. ▮ Less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding because in administra-

tive proceedings parties generally are not represented by counsel. (*Citizen's Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 163 [217 Cal.Rptr. 893].) To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair for them. (*Ibid.*) ██ Moreover, it is clear that the school board was well aware of the specific statutes and guidelines applicable to its decision because its motion to approve the closing of Miraleste and transfer students incorporated references to them. The board thus " 'had its opportunity to act and to render litigation unnecessary, if it had chosen to do so.' " (*Id.,* at pp. 162-163.)

In light of our conclusion that the doctrine of exhaustion of administrative remedies has been satisfied here, we need not address the issue, raised by respondents, of the applicability of the futility exception to the exhaustion of administrative remedies doctrine.

### DISPOSITION

The judgment is affirmed.

Johnson, J., and Woods (Fred), J., concurred.