90 Cal.Rptr.2d 855 (1999)
76 Cal.App.4th 1061
FRIENDS OF SIERRA MADRE et al., Plaintiffs and Appellants,
v.
CITY OF SIERRA MADRE et al., Defendants and Appellants.
No. B129139.
Court of Appeal, Second District, Division Seven.
December 8, 1999.
Review Granted March 1, 2000.
*857 Brandt-Hawley & Zoia, Susan Brandt-Hawley and Rose M. Zoia, Glen Ellen, for Plaintiffs and Appellants Friends of Sierra Madre and Margaret Buckner.
Charles Martin, City Attorney; Landels Ripley & Diamond, Michael H. Zischke, San Francisco, Donald Sobelman and Edward J. Heisel for Defendants and Appellants City of Sierra Madre and Sierra Madre City Council.
*856 LILLIE, P.J.
In April 1998, the voters of the City of Sierra Madre approved a City-sponsored measure, Measure 1-97-1, which, inter alia, removed 29 specific properties from City's Register of Historic Landmarks. Appellant City of Sierra Madre (City) appeals from that part of a judgment granting the petition for writ of mandamus filed by Friends of Sierra Madre and Margaret Buckner (hereinafter collectively referred to as Friends) to set aside and void the election and all approvals of Measure 97-1 on the ground that the Measure violated Elections Code section 9280.[1] Friends cross-appeal from that part of the judgment denying their petition for writ of mandamus seeking to set aside Measure 97-1 on the ground that it is void for failure to comply with the California Environmental Quality Act. (CEQA; Pub. Resources Code, § 21000 et seq.)
The principal issue on appeal is whether City's actions with respect to Measure 97-1, which removed 29 properties from City's Register of Historic Landmarks, were exempt from the provisions of CEQA pursuant to CEQA Guidelines section 15378, subdivision (b)(3), (Cal.Code Regs., tit. 14, § 15378, subd. (b)(3) [formerly § 15378, subd. (b)(4)]), which excludes from the definition of "project" under CEQA "the submittal of proposals to a vote of the people of the state or of a particular community. (Stein v. City of *858 Santa Monica (1980) 110 Cal.App.3d 458, 168 Cal.Rptr. 39.)"

FACTUAL AND PROCEDURAL BACKGROUND
In 1987, City adopted Ordinance 1036, which established the Cultural Heritage Commission of the City of Sierra Madre (CHC) along with a regulatory scheme for preserving structures of cultural and historic significance. In July 1997, by Ordinance 1134, City repealed Ordinance 1036, except for the list of properties designated as historic landmarks thereunder. In general, Ordinance 1134, known as the Historic Preservation Ordinance, made future private property listings on City's Register of Historic Landmarks "voluntary," while retaining on the Register of Historic Landmarks those structures already designated as historic landmarks. The Ordinance set out some of the benefits of designation as a historic landmark, including waiver of City building permit and plan check fees, the use of the State Historic Building Code as the governing building code, Mills Act contracts, and the availability of a conditional use permit procedure for changes of use. (Sierra Madre Mun.Code, § 17.82.060, subd. B.)
Ordinance 1134 added Chapter 17.82 to the City Municipal Code. Municipal Code section 17.82.040, subdivision C, provides in pertinent part: "Properties designated as historic landmarks under Ordinance 1036 shall remain as such until property designations thereunder are de-designated or de-listed by appropriate procedures according to law." Municipal Code section 17.82.080, captioned "Requests to De-Designate" sets out the requirements for an application to de-designate a particular property, requires the application to be submitted to the CHC, for the CHC to hold a public hearing and to make a recommendation on the application to the City Council, which would render a final decision and determine compliance with CEQA. The application to de-designate a property "shall be granted if the finding can be made that the information relied upon by the Commission or the City Council in making the designation is discovered to be false or substantially erroneous thus rendering the property without historic merit." (Sierra Madre Mun.Code, § 17.82.080, subd. A.)
City's demolition ordinance, Ordinance 1142, adopted in August 1997, added section 15.04.115 to City's Municipal Code. That section provides that no permit for the demolition of all or a substantial portion of a building shall be issued for a period of 30 days after the application is made; when an application is made, the applicant must within 10 days submit to City plans for mitigation of any adverse impacts the proposed demolition will cause relating to, inter alia, historic preservation; notice of any application and mitigation report must be made available to every City Council member, official, and Commissioner; prior to issuance of a demolition permit, the applicant must file in general terms, his intended re-use of the property with the Development Services Department; the filing of any notice or report under the ordinance "is not intended to vest any discretion (under CEQA or otherwise) in the Building Official to deny such application. Instead, at the end of the thirty (30) day period, such permit shall be issued unless such issuance is contrary to any law or regulation applicable at that date." (Sierra Madre Mun. Code, § 15.04.115, subd. H.) "The issuance of a demolition permit shall be considered a ministerial duty under the provisions of CEQA Section 15268." (Sierra Madre Mun.Code, § 15.04.115, subd. J.)[2]
*859 According to City's Guidelines for Implementing the California Environmental Quality Act for the City of Sierra Madre,[3] demolition permits are considered to be "ministerial projects" and the City guidelines define ministerial as "a governmental decision involving little or no personal judgment by the public official as to the wisdom or manner of carrying out the project." City's guidelines provide that "Ministerial projects are exempt from the requirements of the State CEQA and the Sierra Madre CEQA Guidelines. No environmental documents are required for such projects." However, a "note" to the demolition permit exemption in City's guidelines states that "If the Demolition Permit is for a structure which has historical implications, the Demolition Permit may be subject to further environmental clearance, pursuant to the provisions of CEQA."
Sometime prior to November 1997, a group of property owners whose properties had been placed on the Register of Historic Landmarks under former Ordinance 1036, petitioned City requesting that their properties be de-designated or removed from the Register. According to a report to the City Council from City's Director of Development Services, staff of the Development Services had interpreted case law as requiring an environmental impact report (EIR) to assess the level of impact associated with de-designating those properties; staff had initiated the process to select a historical consultant for the preparation of a focused environmental impact report, and had organized an informal workshop with the property owners who had requested de-designation before the City Council and the CHC. At that workshop, on November 18, 1997, Development Services staff reported that the cost of preparing an EIR would be approximately $2,500 per property. Only one of the 13 property owners attending the meeting indicated a willingness to financially contribute to the cost of an EIR; all other owners attending felt that their properties had been inappropriately placed on the Register of Historic Landmarks in the first instance and that City should be financially responsible for the cost of the de-listing EIR. According to the staff report, "One idea expressed at the meeting was to place the decision of de-designating those properties identified as wanting to be removed from the Historical Landmark List on the general election ballot as either an initiative or referendum. The attractiveness of this idea is that the initiative and/or referendum is not subject to the provisions of CEQA. Therefore, if the majority of the electorate determines that those properties requesting de-designation shall be de-listed, then this determination does not require CEQA assessment."
On December 9, 1997, the City Council adopted resolution 97-67, ordering submission to the voters of City, in the April 1998 general municipal election, the question of whether "Ordinance 1-97-1" should be *860 adopted.[4] The sample ballot characterized Ordinance 1-97-1 as "An Ordinance of the electors of the City of Sierra Madre, California, delisting certain properties from the official list of historic resources under Ordinances Nos. 1036 and 1134." The sample ballot included as Exhibit A a copy of the full text of Ordinance 1-97-1. Section 1 of Ordinance 1-97-1 stated that the owners of 29 specific properties, whose addresses were listed in section 4, petitioned City to de-list or de-designate their properties in order to remove them from the effects of Ordinances 1036 and 1134; the owners asserted that their properties had been listed on the Historic Resource Register without proper public notice and hearings, or that the properties had been listed without their consent, or that some properties do not qualify as historic resources. Section 4 provided that if the measure was approved by a majority of the voters, then Ordinances 1036 and 1134 would be amended with "section xyz," which would provide in part: "The voters of the City do hereby delist (de-designate) the following described properties from the effects of: 1) ordinances 1036 and 1134; 2) from the effects of the General Plan; and from the effects of any federal, state, or local regulation, guideline or other imposition."
At the City Council meetings on November 25 and December 9, 1997, the Chairperson of the CHC stated that the initiative or referendum process may not free the property owners from CEQA review or an EIR; that the procedure adopted by Council improperly relieved City of the requirement to consider the individual historic merit of each property; that all of the 29 properties are "legitimately on the list" of historic landmarks; and that some property owners had indeed given their approval to be on the list, and there were indeed public hearings and decisions placing the properties on the list. At the City Council hearing on December 9, the Chairperson of the CHC objected to the proposed Ordinance 1-97-1 on the grounds that the statements provided to the voters as to the purpose of the Ordinance were untrue, the Ordinance did not state the consequences of de-designation, and did not state that the properties will still be subject to CEQA review.[5]
At the December 9, 1997, hearing of the City Council, one of the 29 property owners who wanted her property taken off the list of historic landmarks stated, "This initiative [sic], I don't believe, is supposed to determine if properties are historic or not historic. This initiative is to fulfill a City Council promise for a voluntary ordinance.... This initiative is to, yes, save the City $2,500 per property because the owners have already said they're not paying for it. We got on [the list] for free. We'll get off for free or we'll all be back here doing this for the next five years. *861 We've been fighting these things for three years.... The City Council has found a way, we hope, to correct some real ills of the past and correct mistakes of past City Councils and correct mistakes of past Cultural Heritage Commissions.... It's just to allow these properties [to be] taken off the list without cost to the City or the voters or the taxpayers or us."
According to a February 10, 1998, report from the City Administrator to the City Council, the Council by resolution adopted Ordinance 1-97-1 on December 9, 1997; since that time, several issues and concerns had arisen regarding the language of section xyz. As one councilman put it at the hearing on February 10, 1998, an argument was made that the language in section xyz "will exempt the properties from all regulations of any form. It is simply not possible to do that in this state. Every property is subject to the General Plan and zoning. It is not within the power of the initiative process, or the power within the City Council, to make that kind of sweeping change." The ballot materials with respect to Ordinance 1-97-1 had already been submitted and disseminated, and it was too late at that time for the City Council to officially change or amend the wording of the Ordinance; Council would have to wait until November 1998 to submit another measure to the voters.
On February 24, 1998, the City Council adopted Ordinance 1151 "to clarify the language of Ordinance 1-97-1, prior to the public vote thereon on April 14, 1998." Ordinance 1151 stated that "In the event that Ordinance 1-97-1 ... is approved by the voters on April 14, 1998, but not otherwise, then the City Council does hereby amend Section xyz thereof to read as follows: [A] `Section xyz: The voters of the City do hereby de-list (de-designate) the following described properties from the effects of: 1) ordinances 1036 and 1134; 2) from the effects of those portions of the General Plan which relate to historic preservation; and 3) from the effects of any federal, state or local regulation, guideline or other imposition as a result of such properties having been listed as historic under Ordinances 1036 and 1134. Such de-listing shall not deprive the City Council of authority or jurisdiction to modify this Ordinance in the future.'"
At the February 10, 1998, City Council hearing, City's mayor stated that "We are creating a lot of confusion here.... And it seems to me that it is, it is just confusing that more by saying we are going to change it ... prospectively, before it is even passed. And the people that have written the arguments in good faith into the ballot booklet are now faced with having something that doesn't even exist anymore. They have wasted their time and efforts by proposing a particular argument against or for this particular thing and we are changing it out from underneath them.... [¶] [The voters] are going to sit there in the voting booth, looking at particular language, having read a particular argument, and they are going to be asked to vote on something that is already changed."
On March 16, 1998, the City Administrator sent a letter to City's registered voters stating in pertinent part: "As you know, the City of Sierra Madre will be holding a General Municipal Election on Tuesday, April 14, 1998. The purpose of the election is to select three City Council members and to affirm or deny Ordinance No. 1-97-1, relating to the removal of certain properties from Sierra Madre's official list of Historic Resources. Ordinance No. 97-1 was adopted by resolution at the City Council meeting of December 9, 1997.[¶] Since the adoption of Ordinance No. 1-97  1, several issues have arisen regarding the proper interpretation of the pending initiative/referendum. In an effort to address these concerns and provide a greater degree of clarity, the City Council approved Ordinance No. 1151, on February 24, 1998, amending section `xyz' of the initiative/referendum. It should be noted that the approved new language for Ordinance No. *862 1-97-1 re-states the original intent of the ordinance and was approved for clarification purposes only."
Attached to the March 16 letter was the City Attorney's supplemental purported impartial analysis; the supplemental analysis explained the purpose of Ordinance 1151 was to clarify the intent of Ordinance 1-97-1 and to prevent the measure from being "misinterpreted to have a broader scope than was intended"; the analysis also stated that the measure was placed on the ballot by the City Council "without recommendation as to `yes' or `no,' because the City Council was unable after years of study to reach a decision as to whether said 29 properties should remain on the designation list or be removed."[6] In the April 1998 election, Ordinance 1-97-1 was approved by a 2 to 1 margin.
On June 8, 1998, Friends filed petition for writ of mandamus "seeking to set aside and void the election and all approvals relevant to Measure 1-97-1, until full compliance with CEQA and the Elections Code is achieved." In their brief below, Friends maintained the Measure should be voided for two independent reasons: (1) City failed to certify an EIR as to each of the 29 properties, and (2) the ballot and the sample ballot mailed to the voters failed to contain the full text of Measure 1-97-1 as amended by Ordinance 1151, the supplemental impartial analysis and revised arguments for and against the measure, and the legend required by Elections Code section 9280. (See fn. 1, ante.)
In opposition to the petition, City argued that ballot measures like Measure 97-1 are exempt from CEQA pursuant to CEQA Guidelines section 15378, subdivision (b)(3), and prior court decisions, and in any event, Measure 1-97-1 did not have the effect of eliminating future compliance with CEQA in the event the owner of one of the 29 properties desires to demolish a historic structure. According to City, despite the fact that Measure 1-97-1 removes the 29 properties from the Register of Historic Landmarks, the demolition ordinance gives the CHC an opportunity to *863 voice its concerns regarding the issuance of a permit to a historic property and to take action to preserve the historic property. With respect to the claim of a violation of Elections Code section 9280, City argued that the election rendered moot any claim of such violation and the petition failed to allege any grounds to set aside the election under Elections Code section 16100, which provides the exclusive means of challenging the results of an election.
After hearing on the petition, which hearing was not reported, the court took the matter under submission. By minute order on December 9, 1998, the court denied the petition on the CEQA issues, but granted it on ground that the ballot and sample ballot violated Elections Code section 9280. The statement of decision stated that "Mailing the clarification [by Ordinance 1151] to voters does not substantially comply with section 9280; indeed it is logical to assume such a procedure only confused voters, not enlightened them. The purpose of the specific requirements of section 9280 is to directly alert voters to precisely what they are voting on and if not exactly presented to them, to direct them to where they can find it. These violations of law rendered the election process essentially lacking in fundamental fairness." The judgment granting the petition for writ of mandate stated that "The sample ballot neither informed voters of precisely what they were voting on nor directed them to where they could find it, and the election was therefore fundamentally unfair."
City filed notice of appeal from that portion of the judgment granting the petition for writ of mandamus. Friends cross-appealed from that portion of the judgment denying the petition on the CEQA cause of action.

I

ELECTIONS CODE VIOLATION CLAIM
City contends that it substantially complied with Elections Code section 9280 by mailing Ordinance 1151 to the voters prior to the election and that the ballot materials, in light of the other circumstances of the election, were not so inaccurate or misleading to prevent the voters from making an informed choice.
Apart from the issue of whether a challenge to the ballot materials is procedurally defective and can be pursued only by a pre-election writ of mandate (see California Gillnetters Assn. v. Department of Fish and Game (1995) 39 Cal.App.4th 1145, 1164, fn. 12, 46 Cal.Rptr.2d 338), we note that "several courts have implicitly concluded a post-election challenge is available" (ibid), and have addressed the issue on its merits. We thus reject City's claim that the point was rendered moot by the election and that the trial court was precluded from reaching the merits of the claim.
"Strict rules embodied in the Elections Code govern a court's review of a properly contested election. `"It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal. [Citations.]"' [Citations.] ... [¶] Of competing importance, however, is the principle that, `preservation of the integrity of the election process is far more important in the long run than the resolution of any one particular election.' [Citation.] To this end, we have observed that, `The policy in favor of upholding elections appears in the cases in conjunction with the rule that "[technical errors or irregularities arising in carrying out directory provisions which do not affect the result will not [void] the election." [Citations.] Both the policy and the rule manifest the fact that "[c]ourts are reluctant to defeat the fair expression of popular will in elections ..." [citation]; neither has been invoked to uphold an election in the face of illegalities which affected the result  a situation *864 in which the will of the people may be thwarted by upholding an election.' [Citation.]" (Gooch v. Hendrix (1993) 5 Cal.4th 266, 277-278, 19 Cal.Rptr.2d 712, 851 P.2d 1321.)
In Horwath v. City of East Palo Alto (1989) 212 Cal.App.3d 766, 261 Cal.Rptr. 108, the court held that whether defective ballot measure materials will trigger invalidation of a measure on due process grounds depends "on whether the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices. In conducting this inquiry, courts should examine the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts. The ready availability of the text of the ordinance, or the official dissemination and content of other related materials, such as arguments for or against the measure, will also bear on whether the statutory noncompliance rendered the election unfair. Finally, courts should take into account the materiality of the omission or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters." (Id. at pp. 777-778, 261 Cal.Rptr. 108.)
On the instant record, we conclude that the trial court erred as a matter of law in concluding that the alleged violations of Election Code section 9280 rose to the level necessary to invalidate Measure 97-1 on due process grounds. There was extensive public debate on the measure before the election, with several public hearings at which members of the public spoke on both sides of the issue. Moreover, City mailed to the voters the sample ballot and a letter explaining very clearly the purpose and intent of the measure as well as the reason for Ordinance 1151. Any informational deficiencies in the impartial analysis in the ballot were ancillary to the main purpose of the measure, which was clearly and unambiguously set forth in the ballot. There is also no evidence in this record that the voters were confused about the purpose and intent of Measure 1-97-1 or that any alleged deficiencies in the ballot materials affected the fundamental fairness or outcome of the election. The voters of Sierra Madre knew what they were voting for, why they were voting for it, and obviously intended to accomplish what the ballot materials stated the measure intended to accomplish.[7]
Because we conclude the trial court erred in assessing the merits of Friends' petition for writ of mandamus on the Elections Code violation cause of action, we need not address City's challenges to the claim on other grounds, including an alleged bar of the statute of limitations. However, we must now address the cross-appeal, and the issue of whether the trial court erred in denying relief on Friends' CEQA violation cause of action.
City maintains that the trial court correctly determined that submission of Measure 1-97-1 to the voters was not a "project" under CEQA pursuant to Guidelines section 15378, subdivision (b)(3), Stein v. City of Santa Monica, supra, 110 Cal. App.3d 458, 168 Cal.Rptr. 39, and a line of cases relying upon Stein and the foregoing guideline. City argues that it never "approved" Measure 1-97-1 before submitting it to the voters, passage of the ballot measure did not commit the City to any definite course of action because the ballot measure itself did not authorize the demolition or alteration of any building, and that any future applications by the 29 owners for demolition permits will still require CEQA compliance under City's ordinances and the state CEQA Guidelines.
*865 Friends counters that City in fact engaged in discretionary actions approving a course of conduct ultimately resulting in the de-designation of 29 properties from City's Register of Historic Landmarks, all without CEQA compliance; moreover, the result of Measure 1-97-1 is that the protections of City's preservation ordinances will not actually apply to these properties in the future, thus allowing them to escape any CEQA review.

II

CEQA CLAIM

A. Standard of Review.
"CEQA mandates preparation of an EIR on all `projects' that a local agency intends to carry out or approve that `may have a significant effect on the environment.' (Pub. Resources Code, § 21151; Guidelines, § 15002, subd. (f)(1).) A `project' as defined by CEQA and its Guidelines includes the whole of an action which has a potential for resulting in a physical change in the environment, directly or ultimately. (§ 21065, subd. (a); Guidelines, § 15378, subd. (a)....)" (Black Property Owners Assn. v. City of Berkeley (1994) 22 Cal.App.4th 974, 983-984, 28 Cal.Rptr.2d 305; fn. omitted.) "But not all activities which might appear to come within that inclusive definition are subject to CEQA. By its own terms, CEQA applies only to discretionary projects proposed to be carried out or approved by public agencies, and not to ministerial projects. [Citations.] Section 21080, subdivision (b) [of the Public Resources Code], enumerates numerous other projects and activities to which CEQA does not apply, and case law and the Guidelines have added to the list of exemptions." (Id. at p. 984, 28 Cal. Rptr.2d 305.) Whether a particular activity constitutes a project in the first instance is a question of law. (Ibid.)
"[A]ccording to a flowchart in appendix A to the CEQA Guidelines the first analytical step is for the agency to determine whether the activity is a `project' under CEQA and the next step is for the agency to determine the applicability of any exemptions." (East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist. (1989) 210 Cal.App.3d at p. 165, fn. 5, 258 Cal.Rptr. 147.) Thus, if City has applied an erroneous legal standard or analysis in defining the project for CEQA purposes, it has failed to proceed in a manner required by law. (East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist, supra, 210 Cal. App.3d at p. 165, 258 Cal.Rptr. 147.) "This is an issue of law which can be decided on undisputed data in the record on appeal; thus the present appeal presents no question of deference to agency discretion or review of substantiality of evidence." (Fullerton Joint Union High School Dist. v. State Bd. of Education (1982) 32 Cal.3d 779, 795, 187 Cal.Rptr. 398, 654 P.2d 168.)
"The term `project' is broadly defined and includes any activities which have a potential for resulting in a physical change in the environment, directly or ultimately. ([Pub. Resources Code,] § 21065; Guidelines, §§ 15002, subd. (d), 15378, subd. (a); Bozung v. Local Agency Formation Com. (1975) 13 Cal.3d 263, 277 fn. 16, 118 Cal. Rptr. 249, 529 P.2d 1017) The definition encompasses a wide spectrum, ranging from the adoption of a general plan, which is by its nature tentative and subject to change, to activities with a more immediate impact, such as the issuance of a conditional use permit for a site-specific development proposal." (Sierra Club v. County of Sonoma (1992) 6 Cal.App.4th 1307, 1315, 8 Cal.Rptr.2d 473.) For example, where the proposed project itself encompasses a wide spectrum, ranging from the adoption of a general plan to activities with a more immediate site-specific impact, it has been noted that "CEQA mandates the use of tiered EIR's. [Citations.] `"Tiering" refers to the coverage of general matters in broader EIR's (such as on general plans or policy statements) with subsequent narrower EIR's or ultimately site-specific *866 EIR's incorporating by reference to the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared.'" (Chaparral Greens v. City of Chula Vista (1996) 50 Cal.App.4th 1134, 1143, 58 Cal.Rptr.2d 152.)
"`Project' is defined to include amendments to a local general plan or elements thereof." (Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners (1993) 18 Cal.App.4th 729, 739, 22 Cal. Rptr.2d 618.) "CEQA mandates that environmental considerations do not become submerged by chopping a large project into many little ones, each with a potential impact on the environment, which cumulatively may have disastrous consequences." (Burbank-Glendale-Pasadena Airport Authority v. Hensler (1991) 233 Cal. App.3d 577, 592, 284 Cal.Rptr. 498.) "`An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity.' [Citation.] A narrow view of a project could result in the fallacy of division, that is, overlooking its cumulative impact by separately focusing on isolated parts of the whole." (Ibid.)

B. Statutory Provisions Governing Projects Involving Historical Resources.
Public Resources Code section 21084.1 provides: "A project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment. For purposes of this section, an historical resource is a resource listed in, or determined to be eligible for listing in, the California Register of Historical Resources. Historical resources included in a local register of historical resources, as defined in subdivision (k) of Section 5020.1, or deemed significant pursuant to criteria set forth in subdivision (g) of Section 5024.1, are presumed to be historically or culturally significant for purposes of this section, unless the preponderance of the evidence demonstrates that the resource is not historically or culturally significant. The fact that a resource is not listed in, or determined to be eligible for listing in, the California Register of Historical Resources, not included in a local register of historical resources, or not deemed significant pursuant to criteria set forth in subdivision (g) of Section 5024.1 shall not preclude a lead agency from determining whether the resource may be an historical resource for purposes of this section."
"[T]hree categories of historical resources have been created by section 21084.1. First, the mandatory provision of the statute specifies that buildings `listed in, or determined to be eligible for listing in, the California Register of Historical Resources' must in all cases be granted status as historical resources. Second, buildings `included in a local register of historical resources ...' are presumptively historical resources unless the preponderance of the evidence demonstrates otherwise. Third, buildings which do not fall within the mandatory or presumptive categories may still be deemed historical resources at the discretion of the lead agency." (League for Protection of Oakland's etc. Historic Resources v. City of Oakland (1997) 52 Cal.App.4th 896, 906-907, 60 Cal. Rptr.2d 821, fn. omitted.)
There is no dispute in this case that the 29 properties at issue herein, prior to the enactment of Measure 1-97-1, were included in City's local register of historical resources and were thus "presumed to be historically or culturally significant" for purposes of Public Resources Code section 21084.1, unless the evidence demonstrated that the resource is not historically or culturally significant. (See also Guidelines, § 15064.5, subd. (a)(2) ["Public agencies must treat any such resource as significant unless the preponderance of evidence demonstrates that it is not historically or culturally significant"].) There was no evidentiary hearing below to establish that any of the 29 properties were not historically or culturally significant. Thus, according to the statute and *867 its implementing guideline, the 29 properties were presumptively "historical resources." "A project with an effect that may cause a substantial adverse change in the significance of historical resource is a project that may have a significant effect on the environment." (Guidelines, § 15064.5, subd. (b); Pub. Resources Code, § 21151, subd. (a).)
A de-listing or de-designation of a historical resource from a local list thus removes that resource from the presumption of Public Resources Code section 21084.1, and this change in legal status may then lead to a change in the significance of that resource. Guidelines section 15064.5, subdivision (b)(1), defines "substantial adverse change in the significance of a historical resource" as "physical demolition, destruction, relocation, or alteration of the resource or its immediate surroundings such that the significance of an historical resource would be materially impaired." While such de-listing may eliminate an evidentiary presumption that the resource is historically or culturally significant, de-listing does not, however, deprive the lead agency of authority to determine whether a non-listed resource may be a historical resource for purposes of Public Resources Code section 21084.1. (See Guidelines, § 15064.5, subd. (a)(4).)
Such de-designation may also have the effect, as implied by Friends, of removing the delisted property from the jurisdiction of the Cultural Heritage Commission and the Historic Preservation Ordinance. City's Historic Preservation Ordinance (Sierra Madre Mun.Code, ch. 17.82) recognizes that when a property owner files an application for de-designation, the CHC shall hold a public hearing on the application and the CHC's "recommendation shall be forwarded to the City Council, which will render a final decision and determine compliance with the California Environmental Quality Act." (Id. § 17.82.080, subd. B.)
If a property is de-designated, and falls outside the jurisdiction of the CHC and the Historic Preservation Ordinance, as claimed by Friends, then many projects involving that property may be deemed ministerial and thus exempt from CEQA under City's guidelines for implementing CEQA. City deems demolition permits to be ministerial and exempt from the requirements of CEQA, "unless it is for a structure which has historical implications." (Sierra Madre CEQA Guidelines, § IV.C.2.i.) Thus, with respect to demolition permits, a de-listed property with "historical implications" may still be subject to CEQA review by City if City establishes its historical significance. (See Pub. Resources Code, § 21084.1.)
However, as set out above, a significant adverse change in the significance of a historical resource involves more than just demolition, and includes relocation and alteration of the historical resource. There is no indication in our record that another kind of permit or entitlement for use involving a de-listed property, other than a demolition permit, would be afforded the same discretionary treatment by City. In fact, City's guidelines for implementation of CEQA includes "Building Permits" as ministerial projects exempt from CEQA and City's CEQA guidelines. Accordingly, on the instant record, we can conclude that removing a property from Sierra Madre's list of historical landmarks may have the effect of removing that property from the jurisdiction of City's Cultural Heritage Commission and the particular limitations and provisions of the City's Historic Preservation Ordinance. (See Sierra Madre Mun.Code, § 2.28.030, setting out the powers and duties of the CHC.) Although the City Council may still retain the statutory authority to determine whether a non-listed property may be a historical resource under Public Resources Code section 21084.1, such a determination still would not bring the property within the protections of the Historical Preservation Ordinance, or remove it from the ministerial provisions of City's ordinances. In other words, under the provisions of City's *868 ordinances, de-listing may have the effect of removing the property from CEQA requirements in connection with many types of use or building permits for alterations, destruction, or relocation of the property, although demolition permits may still subject the property to CEQA review. Accordingly, the de-listing or de-designation of the 29 properties is a project "with an effect that may cause a substantial adverse change in the significance of an historical resource."
"[I]f historical resources were limited to properties actually listed, owner resistance to inclusion or mere government inaction might forestall preparation of an EIR for a worthy structure, a result certainly not sanctioned by CEQA." (League for Protection of Oakland's etc. Historic Resources v. City of Oakland, supra, 52 Cal.App.4th at p. 907, 60 Cal.Rptr.2d 821.)
On this appeal, City does not dispute that, pursuant to Public Resources Code section 21084.1 and City's Historic Preservation Ordinance, a focused EIR would have been required had City undertaken to process the petitions of the 29 property owners under the provisions of its Municipal Code pertaining to de-designation (Mun.Code, § 17.82.080), or had City itself undertaken to enact an ordinance which de-designated the 29 properties from its list of historic landmarks. Indeed, it is abundantly clear that City submitted Measure 1-97-1 to the voters precisely because it believed that such a course of action would create an exception from the requirements of CEQA. We must now address the issue of whether, under the circumstances of this case, Guidelines section 15378, subdivision (b)(3), is applicable and takes City's actions outside the scope of CEQA.

C. Genesis and Interpretation of Guidelines section 15378, subdivision (b)(3))[8]
In a cogent spring 1998 law review article,[9] Jon Rainwater and Susan Stephenson state the following about the history of section 13578, subdivision (b)(4): "The original intention of the CEQA exemption for the ballot measures is unclear. The exemption is not found in CEQA's statutory language, but in the CEQA Guidelines. The Guidelines are not part of the statute passed by the Legislature, but are promulgated by the state Resources Agency to aid local agencies in implementation of CEQA. The Guidelines in section 15378(b)(4)  originally adopted as section 15037 in 1973  simply state that the `submittal of proposals to a vote of the people' is not to be considered a `project' as defined *869 by CEQA and therefore is not subject to the CEQA review process. Like all sections of the CEQA Guidelines, the ballot measure exception is not binding on the courts, but the Guidelines are generally given `significant weight.' The California Supreme Court [in Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 391, fn. 2, 253 Cal.Rptr. 426, 764 P.2d 278], however, has held that the Guidelines should not be followed when a provision is erroneous or clearly unauthorized." (Rainwater & Stephenson, Too Late in the Game: How Ballot Measures Undercut CEQA (1998) 28 Golden Gate U.L.Rev. at pp. 402-103; fns. omitted.) "This section of the guidelines also excludes from the definition of project `proposals for legislation to be enacted by the State Legislature,'[fn.] `continuing administrative or maintenance activities, such as purchases of supplies, personnel-related actions, general policy and procedure making,' [fn.] and `the creation of government funding mechanisms or other government fiscal activities which do not involve any commitment to any specific project.'" (Id. at pp. 403-404; fns. omitted.)
"When read in context, the exceptions made for `not-projects' seem to be borne out of an effort to avoid encumbering basic governmental procedures that `do not involve commitment to any specific (development) project' by the CEQA review process. The CEQA Guidelines' practical concern for efficient function of government can devolve, when misapplied, into a blanket exemption for environmentally sensitive projects that happen to appear on the ballot." (Rainwater, supra, 28 Golden Gate U.L.Rev. 399, 404.)
Under well-known principles of construction, we conclude that the specific reference in Guidelines section 15378, subdivision (b)(3), to the 1980 Stein case represents a codification of the holding in Stein, which, as the following discussion reveals, is an extremely narrow holding. Thus the guideline's reference to Stein, by necessary implication, means that the guideline was not intended to cover other situations distinguishable from Stein. It can be presumed that the State Office of Planning and Research and Secretary for Resources, who adopted section 15378, were aware of the earlier cases distinguishable from Stein at the time the reference to Stein was first inserted in the Guideline and also in 1998, when the Guideline was renumbered. (See fn. 8, ante.)
The first court to discuss the predecessor guideline to Guidelines section 15378, subdivision (b)(3), People ex rel. Younger v. Local Agency Formation Com. (1978) 81 Cal.App.3d 464, 146 Cal.Rptr. 400, stated: "The determination of whether a deannexation petition is a `project' under CEQA is not resolved by the ambiguous language of [former] section 15037, subdivisions (b)(4) and (c). We must examine the meaning of `project' in the light of an interrelated statutory framework creating and assigning functions to LAFCO [Local Agency Formation Commission of San Diego County]." (81 Cal.App.3d at p. 473, 146 Cal.Rptr. 400; hereinafter Younger.)
In Younger, an association of landowners (BAC) applied to LAFCO for approval of the deannexation of territory located in the City of San Diego which would first cause it to revert to the status of unincorporated lands in San Diego County; contrary to its staff recommendations and without independent evidence of environmental data, LAFCO determined that an EIR was not required because the proposed deannexation represented solely a change in governmental jurisdiction; LAFCO filed a negative declaration containing its findings and approval of the deannexation proposal; BAC then circulated a petition to obtain voter's signatures to place the issue of deannexation of the territory upon the ballot; the State then sought a writ of mandate to compel LAFCO to set aside its negative declaration and prepare an EIR before proceeding with the deannexation proceedings; the *870 trial court found LAFCO's findings and determinations in the negative declaration were not supported by substantial evidence and issued a writ compelling LAFCO to set aside the negative declaration and prepare and consider an EIR; the court of appeal affirmed.
The court in Younger analyzed CEQA as well as the statutory framework regarding LAFCO and deannexation and concluded that the deannexation proposal was a project under CEQA and that former Guidelines section 15037, subdivision (b)(4), did not apply. "The `project' here is more than the `submittal of proposals to a vote of the people.' Rather, it is but the first step required by statute on a deannexation proposal with consequent substantial impact on the physical and human environment. A deannexation proposal requires voter approval only after initial decision by LAFCO and LAFCO approval. If LAFCO disapproves the deannexation proposal, it cannot come to a vote, [¶] ... We conclude the exemption found in section 15037, subdivisions (b)(4) and (c) has no application in light of the express statutory delegation and duties to LAFCO to make its decision on such project." (81 Cal. App.3d at p. 479, 146 Cal.Rptr. 400.)
The court in Younger also distinguished an earlier case, Simi Valley Recreation & Park Dist. v. Local Agency Formation Com. (1975) 51 Cal.App.3d 648, 124 Cal. Rptr. 635, as not factually on point, as in Simi Valley, the proposed detachment of undeveloped land in District "`did not make any change whatever in the uses to which the land might be put'" and would not "involve a choice between two competing general plans or zoning schemes for the area sought to be deannexed." (81 Cal.App.3d at p. 478, 146 Cal.Rptr. 400.)
Younger was followed by Stein v. City of Santa Monica, supra, 110 Cal.App.3d 458, 168 Cal.Rptr. 39. As best as we can glean from the brief recitation of facts in Stein, the voters petitioned to place a rent control amendment on the ballot and, other than placing the initiative on the ballot, City was not engaged in any other related matters or project. The Stein court, expressly finding Younger distinguishable, held that "the act [by City] of placing this initiative measure [for a rent control charter amendment] on the ballot in response to a citizen's petition is not a `project' contemplated by CEQA." (110 Cal.App.3d at p. 460, 168 Cal.Rptr. 39.) The court in Stein acknowledged that Simi Valley was factually distinguishable, but nevertheless found its reasoning persuasive because in Simi Valley "the detachment was purely ministerial and not a discretionary project subject to CEQA." (110 Cal.App.3d at p. 461, 168 Cal.Rptr. 39.) The court in Stein noted: "The procedure employed in amending the charter involved no discretionary activity directly undertaken by the city. It was an activity undertaken by the electorate and did not require the approval of the governing body. The act[ ] of placing the issue on the ballot and certifying the result as a charter amendment qualifies as a non-discretionary ministerial act not contemplated by CEQA." (Id. at pp. 460-461, 168 Cal.Rptr. 39.)
In Fullerton Joint Union High School Dist. v. State Bd. of Education (1982) 32 Cal.3d 779, 187 Cal.Rptr. 398, 654 P.2d 168, the State Board of Education approved a plan to create a new Yorba Linda Unified School District and to transfer responsibility for education of Yorba Linda high school students from the Fullerton Joint Union High School District (Fullerton HSD) to the proposed new district; the State Board directed the proposal to be submitted for approval in an election limited to residents of Yorba Linda. Fullerton HSD petitioned to prevent the election and argued, inter alia, that the State Board's decision was invalid for noncompliance with CEQA. Our Supreme Court held that "the initial environmental study of the effect of detaching Yorba Linda from the Fullerton HSD should have been undertaken before the State Board approved the Plan and submitted it to the voters, and that in failing to undertake that study the *871 State Board violated the requirements of CEQA." (32 Cal.3d 779, 798, 187 Cal.Rptr. 398, 654 P.2d 168.)
The court in Fullerton rejected the State Board's reliance on former Guidelines section 15037(b)(4) because it was clear "that Board's approval of the Plan is not exempt from CEQA merely because that approval must be ratified by the voters." (32 Cal.3d at p. 796, 187 Cal.Rptr. 398, 654 P.2d 168.) Although Fullerton did not mention Stein, Fullerton distinguished Simi Valley on one hand from Younger and Bozung v. Local Agency Formation Com. (1975) 13 Cal.3d 263, 118 Cal.Rptr. 249, 529 P.2d 1017, a case relied upon by Younger. As stated by the court in Fullerton, "The distinction set out in Simi Valley is not between approval of a proposal which requires an election and approval of a proposal which does not. It is between governmental approval which constitutes an essential step culminating in action which may affect the environment (Bozung) and approval of a reorganization which portends no particular action affecting the environment (Simi Valley)." (32 Cal.3d at pp. 796-797, 187 Cal.Rptr. 398, 654 P.2d 168.)
The court in Fullerton also recognized that both the State Board and the voters "are the decisionmakers; they must decide whether to approve the proposed secession, an approval which necessarily entails building a new high school and other actions which may have an environmental effect. In making that decision, the State Board and the voters should have the benefit of relevant environmental data and analysis." (32 Cal.3d at p. 798, 187 Cal. Rptr. 398, 654 P.2d 168.) In addressing the issue of whether an environmental study before the election would be premature, the court acknowledged that "delay of an environmental study until after the election might result in a more specific and useful study," but "[t]he problem with such a delay, however, is that as a practical matter it precludes the alternative of continuing the status quo. Once the voters approve the secession Plan the new Yorba Linda Unified School District will have to build a high school, and Fullerton HSD will have to adjust to the loss of the Yorba Linda students." (32 Cal.3d at p. 797, 187 Cal.Rptr. 398, 654 P.2d 168.) Thus, the court concluded that it was desirable that environmental information be furnished to the decision-makers at the earliest possible stage, i.e., before the State Board approved the Plan and submitted it to the voters. (Id. at pp. 797-798, 187 Cal.Rptr. 398, 654 P.2d 168.)
"As we read the Fullerton and Younger decisions, they support the proposition that the approval of a project by a public agency may be subject to CEQA review even though it is conditioned on the outcome of the vote of the electorate." (Citizens for Responsible Government v. City of Albany (1997) 56 Cal.App.4th 1199, 1218, 66 Cal.Rptr.2d 102.) "As stated in Guidelines section 15352, subdivision (a), the pertinent question is whether the public agency `commits [itself] to a definite course of action....' The holdings of the decisions necessarily imply that a public agency may make such a commitment even though its decision is contingent upon a later vote by an affected district." (Ibid.)
In the instant case, City relies heavily upon Lee v. City of Lompoc (1993) 14 Cal.App.4th 1515, 18 Cal.Rptr.2d 389; Lee itself relied heavily upon Stein. In Lee, the City of Lompoc actually prepared and certified an EIR for a project to amend the general plan and zoning ordinance to permit development of a shopping center; after the city council deadlocked on the issue of approval of the proposed land use amendments, the council decided to resolve the impasse by submitting the issue to the voters as a ballot measure; after the electorate voted to adopt the proposed land use amendments, citizens filed a petition for writ of mandate asserting inadequacies in the EIR and seeking to set aside the certification of the EIR as well as the special election; the trial court denied the petition, and the court of appeal *872 affirmed. Yet, neither the trial court nor the appellate court ever addressed the issue of the adequacy of the EIR, or even found the EIR to be deficient under CEQA; rather, the trial court and the court of appeal instead decided the issue that CEQA did not apply to a city council's decision to call for a special election to amend land use ordinances, but CEQA would apply to the ultimate development project after the zoning changes had been made.
Lee extended Stein by interpreting the ballot exception in Guidelines section 15378, subdivision (b)(3), to apply to ballot measures initiated by council referral as well as to those measures initiated by citizen petition, on the ground that the guideline "does not distinguish between ballot measures initiated by petition and those initiated by council referral." (14 Cal. App.4th at p. 1523, 18 Cal.Rptr.2d 389.)[10]
"Thus, a specific case where a public agency placed a development measure before the voters after a certified EIR was prepared has become the main precedent for legal arguments that no EIR process is required prior to a vote of the people for any and all ballot measures." (Rainwater, supra, 28 Golden Gate U.L.Rev. at p. 412.) We submit that the irony or conundrum noted by Rainwater is due to the fact that the City of Lompoc did not actually rely on Guidelines section 15378, subdivision (b)(3), to excuse compliance with CEQA; rather the city undertook an environmental analysis under CEQA, prepared an EIR, and no doubt expected to make a decision with respect to the project. It was only because the city deadlocked that the matter was submitted to the voters. Thus, when the electorate voted, they had available to them the EIR for the proposal. Given the foregoing circumstances in Lee, the issue of whether the proposal was subject to CEQA or fell under the Guidelines' ballot measure exception was a moot issue of primarily academic import, and the court rendered essentially an advisory opinion on that issue. (See, e.g., Centinela Hospital Assn. v. City of Inglewood (1990) 225 Cal.App.3d 1586, 1596, fn. 8, 275 Cal.Rptr. 901.) In this regard, the most that Lee properly can stand for then, is the rather banal proposition that when a project has undergone CEQA review, but final approval of the project is sought by ballot measure, the decision to place the matter on the ballot does not itself trigger another CEQA review.
The Lee decision was relied upon by the court in Citizens for Responsible Government v. City of Albany, supra, 56 Cal. App.4th 1199, 66 Cal.Rptr.2d 102. In City of Albany, the city council formed a task force to study declining revenues from a horse racing track and to study the possibility of cardrooms at the race track; after public hearings in 1994, the city council passed three resolutions placing on the ballot for voter approval a zoning amendment, a gaming ordinance, and a development agreement with a private developer, all relating to the proposal to build at the race track a two-story structure with up to 34,000 square feet to accommodate 150 gaming tables, restaurants, and bars serving from 800 to 1,000 people. After the measure, designated Measure F, was passed by the voters, the plaintiff filed a complaint for writ of mandate, among other causes of action; the complaint alleged that the city had failed to comply with CEQA before submitting Measure F to the voters. On appeal from the trial court's dismissal of the complaint, the Court of Appeal held that "the Lee decision governs the submittal of the zoning amendments to the voters in the present case, and `the submittal of the zoning amendment to a vote of the people was exempt from CEQA *873 under the provisions of Guidelines section 15378."' (56 Cal.App.4th at p. 1213, 66 Cal.Rptr.2d 102.) However, the court in City of Albany also inexplicably refused to apply the reasoning in Lee to the issue of the development agreement; the court relied instead upon Younger and Fullerton to hold that "the city council approved a project within the meaning of CEQA when it submitted the development agreement to the voters." (Id. at p. 1219, 66 Cal.Rptr.2d 102.)
We can distill from the foregoing cases the following principle as to the application of Guidelines section 15378, subdivision (b)(3): The guideline may apply, as in Stein, when a public agency is acting only in a ministerial manner to place a citizen-initiated measure on the ballot, or as in Lee, when the public agency has already undertaken CEQA review for a project and submits the issue of the project's approval to the voters.
We therefore conclude that Lee and Stein are factually distinguishable from the instant case and not dispositive. As more fully explained below, the "project" for CEQA purposes in the instant case included more than simply the submittal of Measure of 1-97-1 to the voters, and City here was acting in more than its function as an administrator of an election. Rather, City was acting under its authority to make land-use decisions. By several discretionary actions, City committed itself to a course of action to de-designate 29 properties, which de-designation may have a significant effect on the environment.

D. Measure 1-97-1 was Part of a Project Subject to CEQA.
As explained in part II B. above, the removal of the 29 properties from City's list of historic landmarks is a project which requires an EIR because it may lead to a substantial adverse change in the significance of a historical resource. (Pub. Resources Code, § 21084.1.) As in Younger and Fullerton, the project here encompassed more than submitting a ballot measure to the voters; City here took essential steps culminating in the de-designation of historical resources. In addition to placing a measure on the ballot, City undertook several discretionary actions which committed it to the de-designation of 29 properties at issue in this case. City thus "approved" a project subject to CEQA.
At the outset, City staff responded to the petitions of a group of property owners requesting that their properties be de-designating by contacting a consultant for preparation of a focused EIR; City staff had determined that an EIR was required to assess the level of impact associated with de-designating the properties. At that point, City appeared to be treating the petitions as applications to de-designate the properties under City's Historic Preservation Ordinance (see Mun.Code, § 17.82.080), which required CEQA compliance as well as hearings and findings on the issue of whether each of the properties had historic merit. However, when the property owners balked at the prospect and expense of an EIR, City abandoned the existing procedures for de-designation in its ordinances and instead sought to de-designate the 29 properties by amending its Historic Preservation Ordinance. Yet City then did not proceed to enact that ordinance amendment on its own resolution; rather, City presented the ordinance amendment to the voters in a ballot measure. It is clear that the City here possessed the power to require alternate forms of approval for de-designation of the properties, other than by the instant ballot measure; City simply chose not to do so.
It has been held that "where the agency possesses enough authority (that is discretion) to deny or modify the proposed project on the basis of environmental consequences the EIR might conceivably uncover, the permit process is `discretionary' within the meaning of CEQA." (Friends of Westwood, Inc. v. City of Los Angeles (1987) 191 Cal.App.3d 259, 272, 235 Cal. *874 Rptr. 788.) An action is also discretionary "if the city possessed the power to require another form of approval ... which could have been denied or conditioned on the basis of the EIR, but chose not to.... [¶] ... The question is whether [City] exercised any substantial degree of discretion and whether it conceivably could have been guided in the exercise of this discretion by an environmental assessment. If it exercised such discretion  or even if it had the power to exercise discretion but failed to do so  this is a `discretionary project' within the meaning of CEQA." (Id. at p. 273, 235 Cal.Rptr. 788.)
In light of the foregoing, we conclude that City approved a project within the meaning of CEQA when it passed the resolution placing Measure 1-97-1 on the ballot. By failing to conduct any environmental review prior to placing the measure on the ballot (Fullerton, supra, 32 Cal.3d at p. 798, 187 Cal.Rptr. 398, 654 P.2d 168), City did not proceed in the manner required by law.

E. Remedy.
Having determined that City failed to comply with CEQA, we must address the issue of the appropriate remedy, and whether City's CEQA violation constitutes sufficient ground to set aside its resolution placing Measure 1-97-1 on the ballot, which then will invalidate the election with respect to Measure 1-97-1. By its petition, Friends expressly sought to set aside and void the election.
The parties have not brought to our attention any case addressing the issue of whether, or under what circumstances, a CEQA violation can properly result in the setting aside of a City-sponsored ballot measure under Elections Code section 9222, and in the setting aside of the subsequent election. Our own research has revealed that this issue may be one of first impression.
In any event, because City has not contended that the granting of the petition for writ of mandamus and setting aside Measure 1-97-1 on CEQA grounds would contravene any statutory or constitutional principle, we proceed to apply the general principles set out in Gooch v. Hendrix, supra, 5 Cal.4th 266, 19 Cal.Rptr.2d 712, 851 P.2d 1321, and Horwath v. City of East Palo Alto, supra, 212 Cal.App.3d 766, 261 Cal.Rptr. 108. On the instant record, we can only conclude that the failure to comply with CEQA rendered the election on Measure 1-97-1 fundamentally unfair and affected the result. This is so because both the City Council and the electorate were entitled to the benefits of an environmental analysis as to the measure and with respect to the proposal to de-list or de-designate each of the 29 properties, and no environmental analysis was undertaken. The circumstances here clearly are distinguishable from those in Lee v. City of Lompoc, supra, 14 Cal.App.4th 1515, 18 Cal.Rptr.2d 389, where the court rejected the claim that a ballot measure election was invalid due to alleged inadequacies in the EIR. The court in Lee stated that "Courts should uphold an election if at all possible and will do so where technical errors or irregularities do not affect the result. ... [¶] ... The alleged weakness in the EIR concerning insufficient discussion of alternative sites and failure to discuss the difference in consequences of business park compared to commercial development, in the trial court's words, `... are not the kind of informational blockbusters which would be expected to affect the lay voter.'" (14 Cal.App.4th at p. 1525, 18 Cal.Rptr.2d 389.)
In this case, it is a denigration of CEQA to characterize the failure to perform any environmental analysis whatsoever, where it is required by law, as a mere "technical error or irregularity." In addition, our record intimates that some of the 29 properties may indeed properly qualify as historical resources or landmarks; it is likely that an environmental analysis of the historical merit of the properties, and an analysis of the impact of their de-listing or de-designation, would have influenced the *875 City Council and/or the electorate in this case. Moreover, in the absence of any statutory or constitutional bar, we are hesitant to adopt a double standard for application of CEQA, or to exempt the decision of the City to enact an ordinance by ballot measure from the general requirements of law that would be imposed on its decision to directly enact the ordinance itself. (See, e.g., DeVita v. County of Napa (1995) 9 Cal.4th 763, 796, fn. 12, 38 Cal. Rptr.2d 699, 889 P.2d 1019.) The court in DeVita, in holding that a county general plan can be amended by the exercise of the local right of initiative (id. at pp. 795-796, 38 Cal.Rptr.2d 699, 889 P.2d 1019), nevertheless cautioned: "We emphasize that an initiative amendment must conform to all the formal requirements imposed on general plan amendments enacted by the legislative body.... When matters of substance rather than procedure are concerned, courts will not employ a double standard for initiative amendments and general plan amendments enacted by the legislative body." (Id. at p. 796, fn. 12, 38 Cal.Rptr.2d 699, 889 P.2d 1019.)
Here, the violation of CEQA was not a mere matter of procedure, but a matter of substance because the CEQA violation invalidated City's adoption of the resolution placing Measure 1-97-1 on the ballot, and thus infected the subsequent election itself. We thus conclude that the trial court erred in failing to grant Friends' petition for writ of mandamus based on the violation of CEQA.
In requested supplemental briefing on the issue of remedy, City argues, inter alia, that setting aside the election exceeds the remedial authority provided in CEQA and is not necessary to achieve compliance and suggests several other alternative remedies. City proposes that the writ of mandamus could direct CEQA review as to each of the 29 properties prior to any approval by City of an activity that may alter one of the properties, or the writ could direct that City suspend any implementation of the voter-approved measure and direct that CEQA review first be completed with respect to the de-listing of the 29 properties. No authority is cited for a court-ordered "suspension" of implementation of Measure 1-97-1, and we decline to approve such remedy here. As to the remedy of allowing the measure to stand, but requiring CEQA review prior to any future application to alter one of the 29 properties, such post-hoc review does not satisfy CEQA. As pointed out by Friends, the measure removes the properties from the scope of the Historic Preservation Ordinance, leaving no discretionary framework within which to review such application, which would fall outside the jurisdiction of the Cultural Heritage Commission and outside the ordinances applicable to historic preservation. Instead, an application to demolish one of the properties may trigger only the procedures for issuance of a ministerial permit. Under these constraints, any subsequent CEQA review from a historical preservation perspective would be meaningless, indeed.
Accordingly, we conclude that CEQA requires that the resolution placing Measure 1-97-1 on the ballot be set aside, as well as the ensuing election, as requested in Friends' petition for writ of mandamus. We point out that the invalidation of the election in this case is not a matter of discretion of the trial court or of this court; such invalidation results by operation of law (CEQA).

DISPOSITION
The judgment is reversed and on remand the trial court is directed to deny the petition for writ of mandate on the Elections Code violation claim and to grant the petition for writ of mandate on the CEQA violation claim. The parties are to bear their own costs on appeal.
JOHNSON, J., and WOODS, J., concur.
NOTES
[1] Elections Code section 9280 provides that when a city measure qualifies for a place on the ballot, the city attorney shall prepare an impartial analysis of the measure and "In the event the entire text of the measure is not printed on the ballot, nor in the voter information portion of the sample ballot, there shall be printed immediately below the impartial analysis, in no less than 10-point bold type, a legend substantially as follows: [¶] `The above statement is an impartial analysis of Ordinance or Measure ____. If you desire a copy of the ordinance or measure, please call the elections official's office at (insert telephone number) and a copy will be mailed at no cost to you.'"
[2] We interpret the reference in the ordinance to "CEQA Section 15268" to refer to California Code of Regulations, title 14, section 15268, part of regulations known as the CEQA Guidelines. Section 15268 provides in part: "(a) Ministerial projects are exempt from the requirements of CEQA. The determination of what is `ministerial' can most appropriately be made by the particular public agency involved based upon its analysis of its own laws, and each public agency should make such determination either as a part of its implementing regulations or on a case-by-case basis .... [¶] (c) Each public agency should, in its implementing regulations or ordinances, provide an identification or itemization of its projects and actions which are deemed ministerial under the applicable laws and ordinances. [¶] (d) Where a project involves an approval that contains elements of both a ministerial action and a discretionary action, the project will be deemed to be discretionary and will be subject to the requirements of CEQA."
[3] These guidelines were adopted by City in April 1998; City's guidelines state that they "are consistent with, and intended to supplement, the State Guidelines for Implementation of the California Environmental Quality Act," and that both the State Guidelines and the City guidelines apply to any project within Sierra Madre. Although these guidelines were adopted after the City's actions of placing measure 1-97-1 on the ballot, we deem them indicative of City's interpretation of its demolition ordinance in connection with historical landmarks, and thus pertinent to the issue of the impact and consequences of the adoption of Measure 1-97-1.
[4] City is inconsistent in its characterization of "Ordinance 1-97-1." City's brief on appeal characterizes 1-97-1 as a measure submitted to the voters, implying that Measure 1-97-1 was not enacted as an ordinance until it was voted upon and passed by the voters; on the other hand, documents in the administrative record interpret resolution 97-67 as constituting City's adoption of "Ordinance 1-97-1." Although we point out the inconsistencies, we need not resolve this point on this appeal.

As set out in the ballot pamphlet, the text of "Ordinance No. 1-97-1" submitted to the voters stated that "The City Council . . . has referred the issue to whether such properties should be so delisted to the electorate as an initiative pursuant to the provisions of Section 9222 of the California Elections Code."
Elections Code section 9222 provides in pertinent part: "The legislative body of the city may submit to the voters, without a petition therefor, a proposition for the repeal, amendment, or enactment of any ordinance, to be voted upon at any succeeding regular or special city election.... A proposition may be submitted, or a special election may be called for the purpose of voting on a proposition, by ordinance or resolution."
[5] Another speaker at the hearing identified the following historic structures as included among the 29 properties seeking de-designation: the E. Waldo Ward Ranch, the Krafft estate, the Edgar W. Camp House, designed by Greene & Greene, the Bella Vista Terrace Apartments, designed by Irving Gill, and the C.W. Jones House.
[6] There is nothing in this record to support the implication that the City Council engaged in "years of study" let alone any environmental study, as to whether any of the 29 properties on the list should be de-designated under the provisions of either former Ordinance 1036, or Ordinance 1134. In fact, the de-designation standards and procedure in Municipal Code section 17.82. 080 (enacted by Ordinance 1134) were only adopted in July 1997, so it is unclear what issues with respect to the specific 29 properties the City Council was attempting to decide "after years of study." As admitted in the rebuttal to argument against Ordinance 1-97-1, printed in the April 1998 ballot pamphlet, and endorsed by several people, including two City Council members: "The truth is that the council placed this on the ballot to save the tax payers $72,000 on an unnecessary environmental report and also to comply with CEQA. CEQA guidelines (subsection 15378(b)(4)), establishes a statutory exemption for city council actions that allows the submittal of proposals to a vote of the people. `A project that is statutorily exempt is entitled to a blanket exemption from all of CEQA's procedures and policies.' It would be a waste of tax payers money and a drain on the City's limited financial reserves to spend the $72,000 needlessly." Thus, the ballot pamphlet itself asserts that there was in fact no environmental study with respect to de-designation of any of the 29 properties. With respect to the feelings of the owners of the 29 properties, a document containing arguments in favor of Ordinance 97-1 sent to the voters with City's March 16, 1998, letter, stated: "These 29 homeowners are victims of improperly administered legal procedures.... They were placed on a list as part of a blanket designation of over 60 properties without applying the guidelines of the ordinance. Upon designation in 1988, an official City letter was sent to these 29 homeowners that stated, .. . `This is a voluntary program. . . .' This has not been true! Many of these homeowners declined the designation but were included on the list without consent. They have been involuntarily subjected to the discretionary review of the Cultural Heritage Commission for ten years. It's time to respect the rights of these homeowners and make good the promises that the past and present City Councils have made for voluntary participation." There is nothing in our record documenting what steps, if any, each of the 29 homeowners took in 1988 or thereafter to appeal the decision placing them on the list of historic landmarks.
[7] Not before us on this appeal is the issue of the validity of the substantive provisions of Measure 1-97-1, and we express no opinion on this issue. At this point in our discussion, we also set aside the issue of the impact of any alleged CEQA violation on the election. In this section, the issue we address is only whether the alleged violation of Elections Code section 9280 triggers invalidation of the ballot measure on due process grounds.
[8] In October 1998, Guidelines section 15378, subdivision (b)(4), was renumbered as subdivision (b)(3) without any substantive changes. Although some of the cases discussed below deal with former subdivision (b)(4), we deem those cases equally applicable to the current renumbered Guideline. In our discussion, we thus refer to the Guideline by its current number.

We also note that when the guideline was renumbered in 1998, the reference to Stein was retained, although at that time there were other cases which had been decided based upon Stein, and which expanded the scope of Guidelines section 15378, subdivision (b)(4), including Lee v. City of Lompoc (1993) 14 Cal.App.4th 1515, 18 Cal.Rptr.2d 389, and Citizens for Responsible Government v. City of Albany (1997) 56 Cal.App.4th 1199, 66 Cal. Rptr.2d 102. As explained more fully below, we deem it significant that the 1998 amendment of the guideline retained the reference to Stein, but did not mention Lee.
[9] The article discusses two substantial development projects in San Francisco, a ballpark and a football stadium/shopping mall complex, which were approved by the voters in 1996 and 1997 and which are "moving forward," without any environmental analysis "after the board of supervisors and electorate had given a green light for the projects." (Rainwater & Stephenson, Too Late in the Game: How Ballot Measures Undercut CEQA (1998) 28 Golden Gate U.L.Rev. 399; hereinafter referred to as Rainwater.) The article posits that "CEQA's exemption for ballot measures was not meant to allow project proponents to make an end-run around the EIR process," and that the exemption is being misused to undermine CEQA's intent. (Rainwater, supra, 28 Golden Gate U.L.Rev. at pp. 427-428.)
[10] We disagree with this analysis. The reference in the guideline to Stein, if it is to have any meaning at all, must be interpreted as a deliberate distinction between the circumstances in Stein and those in cases like Younger and Fullerton. That distinction is based on whether the public agency is acting in a ministerial as opposed to discretionary capacity.